Red Valve, Inc. v. Titan Valve, Inc., 2019 NCBC 56.

STATE OF NORTH CAROLINA

GASTON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 1064

RED VALVE, INC.; and
HILLENBRAND, INC.,

        Plaintiffs,

v.

TITAN VALVE, INC.; BEN PAYNE;
FABIAN AEDO ORTIZ; and JOHN
DOES 1-10,

        Defendants.

**ORDER AND OPINION ON
PLAINTIFFS' VERIFIED MOTION
FOR ORDER TO SHOW CAUSE AND
SECOND MOTION FOR SANCTIONS
AND CONTEMPT**

1. **THIS MATTER** is before the Court upon Plaintiffs Red Valve, Inc. and Hillenbrand, Inc.'s ("Red Valve" or "Plaintiffs") (i) Verified Motion for Order to Show Cause (the "First Show Cause Motion") and (ii) Second Motion for Sanctions and Contempt (the "Second Sanctions Motion") in the above-captioned case.

2. In support of the Second Sanctions Motion, Plaintiffs offer compelling evidence that Defendants Titan Valve, Inc. ("Titan"), Ben Payne ("Payne"), and Fabian Aedo Ortiz ("Aedo") (collectively, "Titan Defendants") have repeatedly violated the Court's orders concerning the nondisclosure and use of Plaintiffs' confidential, proprietary, and trade secret information, failed to timely return Plaintiffs' information and property consistent with the Court's orders, and intentionally abused the litigation process to gain a perceived litigation or business advantage. Among other things, the evidence shows that the Titan Defendants have repeatedly and continuously used copies of documents containing Plaintiffs' trade secrets and other confidential information which the Court specifically enjoined

Defendants from using during the pendency of this litigation and which the Court ordered Defendants to return to Plaintiffs days after this litigation commenced some seventeen months ago.

3. As will be discussed in more detail below, and having considered the Second Sanctions Motion, the briefs in support of and in opposition to that Motion, the relevant materials associated with the Motion, and the arguments of counsel at the June 4, 2019 hearing on the Second Sanctions Motion (the "June 4 Hearing"), the Court concludes, in the exercise of its discretion, that the proper administration of justice requires the imposition of severe sanctions for the Titan Defendants' conduct. Thus, the Court hereby **ENTERS** the following **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**, and **ORDERS** the relief set forth below. The Court further determines, for the reasons set forth below, that the First Show Cause Motion should be **DENIED**.

> *Nelson Mullins Riley & Scarborough LLP, by David N. Allen, Benjamin S. Chesson, and Anna Majestro, for Plaintiffs Red Valve, Inc. and Hillenbrand, Inc.*
>
> *Bell, Davis & Pitt, P.A., by Edward B. Davis and Derek Bast, for Defendants Titan Valve, Inc., Ben Payne, and Fabian Aedo Ortiz.*[1]

Bledsoe, Chief Judge.

---

[1] Bell, Davis & Pitt, P.A. first appeared as counsel of record for Defendants in this action on October 18, 2018. By Order dated April 4, 2019, the Court granted Michael L. Carpenter, Marshall P. Walker, Christopher M. Whelchel, and the law firm of Gray, Layton, Kersh, Solomon, Furr & Smith, P.A.'s Consent Motion to Withdraw as Counsel for Defendants.

I.

FINDINGS OF FACT[2]

4.      Plaintiffs initiated this action on March 14, 2018, asserting claims against the Titan Defendants as well as former defendant Greg Farris ("Farris"; together with the Titan Defendants, "Defendants"),[3] arising out of Defendants' alleged wrongful conduct in acquiring, possessing, and using Red Valve's alleged confidential, proprietary, and trade secret information in a competing valve manufacturing company that Defendants created shortly before Red Valve terminated Payne's and Aedo's Red Valve employment that same day.[4]

5.      Contemporaneously with the filing of the Verified Complaint, Plaintiffs also filed a Notice of Designation, as well as a Motion for a Temporary Restraining Order (the "TRO Motion") and a Motion for Preliminary Injunction (the "P.I. Motion"). The TRO and P.I. Motions sought injunctive relief against all Defendants based on

---

[2]  The procedural and factual background of this matter is set out more fully in *Red Valve, Inc. v. Titan Valve, Inc.*, 2019 NCBC LEXIS 5 (N.C. Super. Ct. Jan. 11, 2019), *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 41 (N.C. Super. Ct. Apr. 17, 2018), *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 31 (N.C. Super. Ct. Apr. 10, 2018), and *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 139 (N.C. Super. Ct. Mar. 14, 2018).

[3]  On June 6, 2019, the Court granted Plaintiffs and Farris's Joint Motion to Enter Consent Order, dismissing all claims against Farris. (*See* Consent Order Between Red Valve, Inc. & Hillenbrand, Inc. & Greg Farris, ECF No. 212.)  Plaintiffs have withdrawn the Second Sanctions Motion to the extent they asserted it against Farris.

[4]  Aedo, Payne, and Farris incorporated Titan on February 6, 2018 and thereafter jointly owned and operated that entity.  *Cf.* N.C. R. Civ. P. 37(b)(2) (permitting sanctions if "a party or an officer, director, or managing agent of a party" fails to obey a court order regarding discovery); *Vorachek v. Citizens State Bank*, 421 N.W.2d 45, 49–50 (N.D. 1988) ("[I]f the co-parties are a corporation and its officer or managing agent sued in his individual capacity, his failure may serve as a predicate for the imposition of the sanction against both." (quoting 4A Moore's Federal Practice ¶ 37.05 at 37-107 n.21 (2d ed. 1987)).

Plaintiffs' claims for misappropriation of trade secrets and against Aedo separately for breach of contract. The case was designated as a mandatory complex business case later on March 14, 2018 by the Chief Justice of the Supreme Court of North Carolina and assigned to the undersigned.

A.     Temporary Restraining Order & Expedited Discovery

6.     Promptly upon designation, the Court held a hearing on the TRO Motion (the "March 14 Hearing"), *ex parte*, at which Plaintiffs' counsel was in attendance and presented evidence and argument. At the conclusion of the March 14 Hearing, the Court entered a temporary restraining order (the "TRO"), which became effective that day.[5] *See Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 139 (N.C. Super. Ct. Mar. 14, 2018). The TRO required Defendants to "return to Red Valve any and all Red Valve property in their possession, including any property containing Red Valve's Trade Secrets[6] or any other confidential and proprietary information of Red Valve" within three days. *Id.* at *7. The TRO also restrained and enjoined Defendants (i) "from directly or indirectly using, disclosing, relying on, or otherwise misappropriating Red Valve's Trade Secrets and other confidential information," *id.* at *5, and (ii) "from contacting any of Red Valve's current or known prospective customers identified in Red Valve's Trade Secrets," *id.* at *7.

---

[5] Although the TRO was scheduled to expire on March 24, 2018, the Court granted the parties' joint motion to extend the TRO on March 22, 2018 and extended the TRO through April 6, 2018.

[6] The TRO defined "Trade Secrets" as Plaintiffs' "Price Data, Customer Database, Design Documents, Manufacturing Processes, and Vendor Lists." *Red Valve, Inc.*, 2018 NCBC LEXIS 139, at *3. In turn, the TRO specifically defined those five Trade Secrets. *Id.* at *5–7.

7.      On March 28, 2018, Plaintiffs filed a motion for expedited discovery (the "Expedited Discovery Motion") in preparation for an April 5, 2018 hearing on the P.I. Motion (the "April 5 Hearing"). The Court subsequently entered an Order on March 30, 2018 (the "Expedited Discovery Order") granting in part and denying in part the Expedited Discovery Motion. (Order Pls.' Mot. Expedited Disc. [hereinafter "Expedited Disc. Order"], ECF No. 23.) The Expedited Discovery Order required Defendants to produce to Plaintiffs no later than April 3, 2018, among other things, (i) "all materials containing Red Valve's Trade Secrets, as defined in the Court's March 14, 2018 TRO" and (ii) "all documents describing all efforts undergone to create Titan Valve prior to March 14, 2018." (Expedited Disc. Order 5.) The Expedited Discovery Order further required Defendants to "examine their email accounts (personal or otherwise)" and "return to Red Valve any and all Red Valve property in their possession, including any property containing Red Valve's Trade Secrets[, as defined in the TRO,] or any other confidential and proprietary information of Red Valve" by no later than April 3, 2018. (Expedited Disc. Order 5.)

8.      On April 3, 2018, Defendants produced to Plaintiffs approximately 3,215 files in a variety of formats, as well as twenty-one additional screenshots of certain text messages exchanged between the individual Defendants (the "April 3 Production"). *Red Valve, Inc. v. Titan Valve, Inc.*, 2019 NCBC LEXIS 5, at *5 (N.C. Super. Ct. Jan. 11, 2019).

B.    Preliminary Injunction

9.    All parties that have appeared in this action were represented by counsel at the April 5 Hearing on Plaintiffs' P.I. Motion.  With the parties' consent and for good cause shown, the Court, by Order dated April 5, 2018, extended the TRO until April 10, 2018.  (Order Extending TRO, ECF No. 33.)

10.    On April 10, 2018, the Court entered an Order and Opinion on Plaintiffs' P.I. Motion, as corrected on April 17, 2018 (the "P.I. Order").  *See Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 41 (N.C. Super. Ct. Apr. 17, 2018).  The Court found that Plaintiffs' evidence showed "Aedo had been using a Dropbox account connected to his Red Valve email address to store thousands of files, many of them containing Red Valve's confidential and proprietary information" and that "[m]uch of the confidential and propriety information stored in the Red Valve Dropbox account was contained in a subfolder labeled 'Titan.' "  *Id.* at *11.  The Dropbox account contained, among other things, (i) "information pertaining to Red Valve's current and prospective customers"; (ii) "Red Valve price factor sheets and Price Books"; (iii) "in the Titan subfolder, numerous Red Valve design drawings"; and (iv) "information related to in-house and [proprietary] manufacturing processes that are not in the public domain[.]"  *Id.* at *11–12.  Based in part on the existence of the Dropbox account (the "Dropbox Account"), the Court found that, together "[w]ith Farris, Aedo and Payne actively worked to launch Titan during their employment with Red Valve, and during that time, they also actively acquired and stored information relating to

and constituting Red Valve's Customer Database, Price Data,[7] Design Documents, and Protectable Manufacturing Processes," which the Court preliminarily concluded were protectable trade secrets of Plaintiffs (the "Trade Secrets"). *Id.* at *33–34.

11.    After noting that "Defendants' actual and threatened misappropriation of Plaintiffs' Trade Secrets, if not enjoined, [would] damage Plaintiffs' business, adversely impact Red Valve's market position, and dull its competitive advantage[,]" *id.* at *38–39, the Court concluded that Plaintiffs had "demonstrated a likelihood of success on the merits of their claim for misappropriation of trade secrets[,]"[8] *id.* at *36.  The P.I. Order accordingly "**RESTRAINED** and **ENJOINED** [Defendants], during the pendency of this action, from using, disclosing, or distributing Plaintiffs' Customer Database, *Price Data*, *Design Documents*, and Protectable Manufacturing Processes[.]"  *Id.* at *43 (emphasis added).

12.    Additionally, pursuant to paragraph 85(b) of the P.I. Order, each Defendant was required, on or before April 19, 2018, to:

> (i) return to Plaintiffs all of Plaintiffs' property, including but not limited to Plaintiffs' Trade Secrets, and (ii) certify under oath in a written statement filed with the Court that Defendant has returned to Plaintiffs all of Plaintiffs' property in Defendant's possession and further that Defendant does not retain or possess any Red Valve property.

---

[7]  The P.I. Order defined "Price Data" as "the prices Red Valve charges for its products and the formula it uses to price products." *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *14.  More specifically, the Court stated in the P.I. Order that the "Price Data contains both a compilation of information that includes Red Valve's pricing history for each of its products and Red Valve's formula for preparing price quotes, which is summarized in Red Valve's Price Book." *Id.* at *28.

[8] The Court similarly concluded on the evidence of record that Plaintiffs had shown a likelihood of success on their breach of contract claim against Aedo. *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *36–37.

*Id.*

13.     Upon Defendants' request, by Order dated April 17, 2018 (the "Order Clarifying P.I."), the Court deferred the deadline for Defendants' performance under paragraph 85(b) of the P.I. Order as it related to Plaintiffs' electronically stored information ("ESI") in Defendants' possession.  (Order Clarifying P.I. 2–3, ECF No. 43.)  The Order Clarifying P.I. required that the parties promptly meet, confer, and propose a return and preservation protocol concerning Defendants' return of ESI no later than April 27, 2018.  (Order Clarifying P.I. 2.)  The Order Clarifying P.I. did not, however, extend the April 19, 2018 compliance date as to Plaintiffs' non-ESI property in Defendants' possession.   (Order Clarifying P.I. 2–3.)   On April 19, 2018, all Defendants certified under oath that they had returned to Plaintiffs all of Plaintiffs' non-ESI property.  (*See* Certification Fabian Aedo Oritz, ECF No. 48; Certification Ben Payne, ECF No. 47; Certification Greg Farris, ECF No. 46; Certification Greg Farris Behalf Titan Valve, Inc., ECF No. 45.)

14.     The parties then negotiated for more than six months the return and preservation protocol (the "Return Protocol") required under the Order Clarifying the P.I. Order, seeking the Court's guidance on multiple occasions during this time on a number of topics.  The parties finally agreed to, and the Court approved, the terms of the Return Protocol in September 2018, and the Court formally entered the Return Protocol on February 27, 2019.  (*See* Return & Preservation Protocol [hereinafter "Return Protocol"], ECF No. 162.)  Envista Forensics ("Envista"), a forensic expert

retained by Defendants, was responsible for carrying out the Return Protocol.[9] (Return Protocol 2.)

15. The Return Protocol consisted of four phases: (i) device collection and imaging, (ii) identification of Red Valve property, (iii) preservation and return, and (iv) deletion. (*See generally* Return Protocol.) Under its terms, Defendants were required to complete the "return" phase by November 7, 2018 and the "deletion" phase by November 19, 2018. Despite these deadlines, Defendants did not produce all of the "return" documents under the Return Protocol until November 12, 2018, or complete the "deletion" phase until approximately December 12, 2018.

C. First Sanctions Order & Device Discovery Protocol

16. On November 5, 2018, Plaintiffs filed a Motion for Sanctions (the "First Sanctions Motion"), alleging that Defendants improperly withheld documents in violation of the Expedited Discovery Order.[10] After full briefing, the Court held a hearing on the First Sanctions Motion on December 18, 2018, at which all parties that have appeared to this action were represented by counsel.

---

[9] The Return Protocol included provisions to ensure that Defendants' privileged documents were not disclosed to Plaintiffs. *Cf. Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, No. COA18-1054, 2019 N.C. App. LEXIS 658, at *37–38 (N.C. Ct. App. Aug. 6, 2019). For instance, after Envista generated the final search results, Defendants' counsel had the opportunity to examine the files and documents to identify and remove privileged materials. (Return Protocol 8–9, n.7.) Defendants have not contended at any time in this action that their privileged information has been compromised or disclosed to Plaintiffs or other third parties.

[10] Additionally, on November 6, 2018, Plaintiffs filed the First Show Cause Motion. The Court heard arguments on the First Show Cause Motion at the December 18, 2018 hearing.

17.    The Court granted the First Sanctions Motion by Order and Opinion dated January 11, 2019 (the "First Sanctions Order").  *See Red Valve, Inc. v. Titan Valve, Inc.*, 2019 NCBC LEXIS 5, at *33 (N.C. Super. Ct. Jan. 11, 2019).    The Court concluded that "Defendants' April 3 Production was substantially incomplete," *id.* at *16, and that "Defendants failed to comply with the Expedited Discovery Order by withholding responsive documents and concealing material, adverse evidence,"[11] *id.* at *30.

18.    Among other sanctions,[12] the Court ordered the forensic examination of all data sources used by Defendants since July 2017.  *Id.* at *33.  Specifically, the Court permitted Plaintiffs' forensic expert, Reliance Forensics, LLC ("Reliance"), "to conduct a forensic examination of all data sources used by Defendants after July 2017 . . .—regardless of whether such data sources were subject to the Return Protocol—for data and

---

[11]    As an illustrative example, as part of the April 3 Production, Defendants produced a screenshot of a January 27, 2018 text message exchange among the individual Defendants. *Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *21–22.  Defendants omitted the phrase "based on a rv [i.e., Red Valve] drawing" from a text message sent by Aedo, which fully stated "Look at the video he did for me *based on a rv drawing*."  *Id.* at *22.  The Court concluded that the "omitted portion" was "critical," "highly relevant," and "completely change[d] the factual context of the document as produced."  *Id.*

[12]    The Court also ordered Defendants to pay Plaintiffs' reasonable expenses incurred in bringing the First Sanctions Motion, including Plaintiffs' reasonable attorneys' fees and expenses, *Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *30–31, in the total amount of $108,667.50.    Plaintiffs sought as a further sanction an order preemptively striking Defendants' answer to newly asserted tortious interference claims contained in Plaintiffs' Amended Complaint and precluding Defendants from conducting discovery on those claims. *Id.* at *31–32.  The Court concluded at that time, however, that denying Defendants the opportunity to defend against Plaintiffs' tortious interference claims was inappropriate in light of "the preference within the North Carolina Rules of Civil Procedure for adjudicating claims on the merits," the other sanctions awarded in the First Sanctions Order, and the facts and circumstances of the case as of that time.  *Id.* at *32–33.

metadata related to Defendants' *access and use* of such data sources."[13]  *Id.* (emphasis added).   The Court did not, however, permit Reliance or Plaintiffs "to review substantive file information contained on these data sources[.]"  *Id.*

19.    As required by the First Sanctions Order, the parties negotiated a device discovery protocol (the "Device Discovery Protocol") to govern the forensic examination.  With the parties' consent, the Court entered the final Device Discovery Protocol on February 5, 2019.  (*See* Device Disc. Protocol [hereinafter "Disc. Protocol"], ECF No. 152.)

20.    Within the Device Discovery Protocol, Defendants represented that they had identified all data sources falling within the scope of that Protocol.  (Disc. Protocol ¶ 2.)   The Device Discovery Protocol required Defendants to file a certification describing all efforts they took to identify data sources falling within the Protocol no later than February 8, 2019.  (Disc. Protocol ¶ 2.)   The Protocol further required Defendants to submit to Reliance all data sources, including physical devices and cloud-based accounts, falling within the scope of the Protocol no later than February 13, 2019.  (Disc. Protocol ¶ 2.)

---

[13] The Court concluded that a forensic examination was particularly appropriate in light of evidence tendered by Plaintiffs tending to show Defendants had spoliated evidence. Specifically, Plaintiffs offered evidence showing that (i) Aedo admitted to attempting to delete files from the Dropbox Account on the day of his termination; (ii) on the night of his termination, Aedo remotely wiped his Red Valve iPhone and thus deleted any text messages, chats (including iMessages), call records, internet history, voicemails, and any other use data generated on the device from March 2017 through his termination; and (iii) Payne claimed that his Red Valve cell phone was inaccessible, and had not produced its contents. *Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *24.  Moreover, "[t]he need for a forensic examination [was] further highlighted by Red Valve's failure to locate and produce a number of USB devices that were connected to Payne's Red Valve computer during the relevant time period that potentially contain[ed] relevant information." *Id.* at *25.

21.    The Device Discovery Protocol process was delayed even before it started when, on February 8, 2019 at 4:55 PM, Aedo moved for an extension of the previously agreed-upon February 8 (certification) and February 13 (data sources) deadlines. Aedo's motion was not based on circumstances that were unforeseeable when Aedo and his co-Defendants agreed to the February 8 and February 13 deadlines on February 4, and, as a result, the Court denied Aedo's motion for extension on February 12, 2019.  (Order Def. Aedo's Mot. Extension Time, ECF No. 157.)  By operation of Business Court Rule 4.1, the Court's denial of Aedo's motion caused the deadlines for Aedo's Device Discovery Protocol compliance to be extended until February 14.  *See* BCR 4.1(c) ("If the Court denies [a motion for extension], then the filing is due or the act must be completed no later than 5:00 p.m. Eastern Time on the second business day after the Court issues its order, unless the Court's order provides a different deadline.").  Even with this additional extension, Aedo failed to meet either deadline.  Indeed, his physical devices were not delivered to Reliance until February 25, and while he filed an unnotarized copy of his certification on February 13, he did not file the required notarized certification until March 12.

22.    Reliance timely completed the forensic examination contemplated under the Device Discovery Protocol.  In particular, Reliance created forensic images (or a best-possible extraction, as applicable) of Defendants' data sources using standards and practices generally accepted in the field of digital forensics and created metadata reports of forensic artifacts bearing on the files on each data source, as well as the access and use of each data source ("Forensic Reports").  (*See* Pls.' Reply Br. Supp.

Second Mot. Sanctions & Contempt Ex. A, at ¶¶ 4–5 [hereinafter "Walton May 2019 Aff."], ECF No. 204.1.)[14]  One of the Forensic Reports Reliance created was a "File Exploring" report ("File Exploring Report"), which records metadata including: every file opened on a device, the date and time the file was opened, an "access count" (which records the number of times the specific file has been opened from its specific location), and the folder path for the file.  (Walton May 2019 Aff. ¶¶ 4, 10–11.)  The File Exploring Report does not record each time a file is viewed on a device if the file has not been closed and reopened.  (Walton May 2019 Aff. ¶ 12.)

23.   Reliance then provided the Forensic Reports to Defendants' counsel for privilege and other appropriate redactions as required by the Device Discovery Protocol.[15]  (Walton May 2019 Aff. ¶ 5.)  After Defendants' counsel reviewed and redacted the Forensic Reports, Reliance provided the Reports to Plaintiffs' counsel on a rolling basis, which Plaintiffs' counsel then reviewed together with Reliance.

---

[14]  Clark C. Walton, Esq. ("Walton") is the principal digital forensic expert for Reliance.

[15]  As the scope of the Device Discovery Protocol was limited to "access and use" data and did not permit Plaintiffs or Reliance "to review substantive file information," *Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *33, there was limited, if any, risk that Defendants' privileged information could be disclosed.  Nevertheless, the Device Discovery Protocol agreed upon by the parties provided that Defendants' counsel would have the opportunity to review the access and use data to identify and redact privileged information.  (Disc. Protocol ¶¶ 6, 10.) Moreover, in negotiating the terms of the Device Discovery Protocol, a dispute arose as to the proper scope of redactions to the "Internet Search History," (Disc. Protocol ¶ 10), lists that would be generated.  By Order dated February 5, 2019, the Court agreed with Defendants that Defendants' counsel should be permitted to redact "sensitive personal information, including social security numbers, usernames and passwords, financial account numbers, any Defendant's specific medical records, personal health information and medical history, and personal internet browsing habits which are wholly unrelated to the subject matter of this litigation and whose disclosure would reasonably serve no purpose other than embarrassment."  (Order Device Discovery Protocol Dispute, ECF No. 151; Disc. Protocol ¶ 10(f).)

24. The Titan Defendants do not dispute the accuracy of the information contained in the Forensic Reports.

25. The Second Sanctions Motion relates, in part, to the information uncovered in Reliance's forensic examination.

1. Aedo's Access to and Use of Red Valve Price Data Through the Shadow Dropbox

26. The Forensic Reports show that on March 16, 2018—two days after the Court entered its TRO—Aedo moved electronic copies of Red Valve's pricing documents from the Dropbox Account that Aedo created during his employment with Red Valve onto an external drive. Aedo did this without notice to Plaintiffs or the Court, and his actions were in plain violation of the Court's TRO.

27. As noted above and as discussed at length in the P.I. Order, during his employment at Red Valve, Aedo used the Dropbox Account to store thousands of files, many containing Red Valve's proprietary information, including Red Valve pricing documents. In connection with Aedo's termination on March 14, 2018, Plaintiffs changed the password to the Dropbox Account to eliminate Aedo's access to that account.

28. Reliance's forensic examination revealed, however, that unbeknownst to Plaintiffs, Aedo retained a "local" copy of the Dropbox folder on his HP Model 15t laptop (the "Aedo HP Laptop") containing the same Red Valve confidential, proprietary, and trade secret information that Defendants had taken from Red Valve

and that the Court had ordered them to return to Plaintiffs in the TRO.[16] (*See* Walton May 2019 Aff. ¶ 19.) In particular, Reliance's investigation shows that on March 16, 2018, Aedo accessed the "local" copy of the Dropbox Account and saved Red Valve pricing documents, including files titled "2017.10.10_Red Valve Price Book.pdf" and "Pricing_Redvalve_factor sheets latin america.pdf," to an external "STORE N GO" USB drive, in essence a "shadow" Dropbox account consisting of these files (the "Shadow Dropbox"). (Walton May 2019 Aff. ¶¶ 19–20; Walton May 2019 Aff. Ex. A, at Lines 3963–3964; Walton May 2019 Aff. Ex. B, at Lines 5950, 10049–10053.)[17] The Red Valve Price Book and the price factor sheet plainly constitute Red Valve's "Price Data," which the Court preliminarily found to be a Red Valve Trade Secret and ordered Defendants to return to Plaintiffs. *See Red Valve, Inc.*, 2018 NCBC LEXIS 139, at *3, *5 (defining "Price Data" as the "prices Red Valve charges for its products and the formula it uses to price products").

29. Nevertheless, in an affidavit submitted in opposition to Plaintiffs' P.I. Motion, Aedo denied having access to any of Red Valve's pricing information, swearing that he did not "take any pricing list" when "leaving [his] employment with Red Valve." (Defs.' Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. C, at ¶ 13, ECF No. 25.) In the same affidavit, Aedo further swore that he "no longer [had] access to that Dropbox

---

[16] As discussed *infra*, the Titan Defendants now contend that the Aedo HP Laptop is missing after the completion of the Device Discovery Protocol.

[17] The exhibits to Walton's May 10, 2019 Affidavit are Excel spreadsheets containing tens of thousands of entries. As these files are not compatible with the Court's filing system, Plaintiffs tendered the exhibits in native format to the Court via e-mail. The exhibits have been retained and can be made a part of the court record in the event of an appeal.

account (or the Titan folder), or any information contained therein." (Defs.' Br. Opp'n Pls.' Mot. Prelim. Inj. Ex. C, at ¶ 30.) As shown above, those representations to the Court are demonstrably false.

30. Reliance's forensic examination also established that on April 13, 2018—three days after the P.I. Order again "**RESTRAINED** and **ENJOINED**" Defendants "from using, disclosing, or distributing Plaintiffs' . . . Price Data" and required Defendants to return all Red Valve property, *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43—Aedo accessed the Red Valve Price Data from the Shadow Dropbox, (Walton May 2019 Aff. Ex. B, at Lines 10049–10053).

31. The examination further revealed that Aedo accessed the Red Valve Price Data from the Shadow Dropbox on September 12, 2018. (Walton May 2019 Aff. Ex. A, at Lines 3959–3964; Walton May 2019 Aff. Ex. B, at Lines 5950, 10049–10053.) On that date, less than thirty minutes after he opened the "Titan Price Book," Aedo accessed the "Pricing_Redvalve_factor sheet latin America.pdf" and the Red Valve pricing sheet for a Series 5400 Control Pinch Valve. (Walton May 2019 Aff. Ex. A, at Lines 3962–3967.) Minutes later, Aedo again opened a Titan Price Book, this time Titan's Price Book for its PLT pinch valve and Titan's "Pinch Calculator." (Walton May 2019 Aff. Ex. A, at Lines 3959–3960; *see* Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt Ex. 3 [hereinafter "Aedo April 2019 Aff."], at Ex. L, ECF No. 196.1.) Thus, not only does the Reliance examination show that Aedo accessed Red Valve's Trade Secrets, but the temporal proximity between Aedo's access of Red

Valve's pricing information and of Titan's Price Books is persuasive evidence that Aedo used Red Valve's confidential information to further Titan's business objectives.

32. In addition, although the Shadow Dropbox contained Red Valve pricing documents, Aedo did not identify the "STORE N GO" USB drive or return the files as required in response to written discovery, the Return Protocol, and the Device Discovery Protocol. (*Cf.* Walton May 2019 Aff. ¶ 20.) Plaintiffs discovered the Shadow Dropbox only through Reliance's Forensic Reports.

   2. <u>Aedo's Access to and Use of Sealed Court Documents Containing Red Valve Trade Secrets</u>

33. The Forensic Reports generated through the Device Discovery Protocol further show that Aedo improperly accessed sealed Court documents containing Red Valve Trade Secrets on numerous occasions.

34. In particular, on August 3, 2018, an employee of Gray Layton Kersh Solomon Furr & Smith ("Gray Layton")[18]—Defendants' only counsel of record at the time—"inadvertently" sent Payne, Aedo, and Farris confidential Red Valve documents containing exhibits that Plaintiffs filed in support of their P.I. Motion.[19]

---

[18] On April 2, 2019, Gray Layton filed a consent motion to withdraw as counsel for Defendants due to a "potential conflict of interest" between counsel and Defendants. (*See* Consent Mot. Withdraw Counsel, ECF No. 182.) The Court granted the motion on April 4, 2019. The law firm of Bell, Davis & Pitt, P.A. remains counsel of record for Defendants. All conduct at issue in this Order and Opinion occurred before Gray Layton moved to withdraw and before Bell, Davis & Pitt, P.A. became Defendants' lead counsel.

[19] The P.I. Exhibits are not the only sealed documents containing Red Valve's Trade Secrets that Gray Layton sent to Defendants. Reliance's forensic examination revealed that an attorney with Gray Layton sent at least two other sealed documents containing Red Valve's Trade Secrets to Defendants, one on April 17, 2018 and the other on May 17, 2018. Those files remain on devices that were subject to the Return Protocol as well as devices that Defendants did not submit to the Return Protocol. Gray Layton did not notify the Court of these inadvertent disclosures to Defendants.

(Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt Ex. 2, ECF No. 196.1.) The files, entitled "Exhibits Part 1.2.pdf," "Exhibits Part 1.1.pdf," and "Exhibits Part 2.pdf" (the "P.I. Exhibits"), were offered by Plaintiffs in connection with the P.I. Motion to identify their relevant trade secrets. The P.I. Exhibits included Red Valve's Price Book, a price factor sheet, a design drawing, and a build sheet, (*see* Pls.' Br. Supp. Second Mot. Sanctions & Contempt Ex. A, at ¶ 17 [hereinafter "Walton March 2019 Aff."], ECF No. 169.1; Walton March 2019 Aff. Exs. D, E, F),[20] all of which the Court preliminarily found to be trade secrets and restrained and enjoined Defendants from using or possessing through the P.I. Order, *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *36, *43. The P.I. Exhibits were filed under seal and, as the Titan Defendants concede, Defendants should never have received unredacted copies of those documents. *See* BCR 5.2(c).

35. After learning that Gray Layton had sent Defendants the P.I. Exhibits in mid-January 2019,[21] Plaintiffs raised the issue with Defendants' counsel on three separate occasions to gain assurance that Defendants would not access the P.I. Exhibits: first, by letter dated January 15, 2019; next, by letter dated January 16,

---

[20] As with the exhibits to Walton's May 10, 2019 Affidavit, the Exhibits to Walton's March 12, 2019 Affidavit have not been filed on the Court's docket due to their size and file type. These exhibits have been retained and can be made a part of the court record in the event of an appeal.

[21] The Gray Layton employee also sent the P.I. Exhibits to the individual Defendants' former Red Valve e-mail addresses. On August 6, 2018, Plaintiffs' counsel notified Gray Layton that "Red Valve, not the defendants, now has access to those Red Valve addresses" and that, "[u]nless [Defendants] want Red Valve to retain those emails," Plaintiffs' counsel would instruct Red Valve "to delete the misdirected emails without reviewing them." (*See* Pls.' Br. Supp. Second Mot. Sanctions & Contempt Ex. C, ECF No. 169.1.) There is no evidence that Plaintiffs' counsel reviewed the e-mails prior to ordering Red Valve to delete them.

2019; and finally, during a February 6, 2019 meet-and-confer discussion. (*See* Pls.' Br. Supp. Second Mot. Sanctions & Contempt Exs. D, E, F, ECF No. 169.1.)

36. Nevertheless, the forensic examination showed that Aedo not only possessed the P.I. Exhibits, but repeatedly and continuously accessed the P.I. Exhibits through and including February 11, 2019—a period including the Court's First Sanctions Order and extending until two days before the deadline for Defendants to provide Reliance with their devices under the Device Discovery Protocol, a deadline which Aedo failed to meet.

37. Plaintiffs offer evidence tending to show that Aedo used the P.I. Exhibits for Titan's business purposes, including to compete with Red Valve. For instance, on February 11, 2019, Aedo accessed files containing quote activities for Titan at 11:20 AM to 11:30 AM on the Aedo HP Laptop. (Walton March 2019 Aff. Ex. C, at Lines 269–274.) At 11:47 AM, Aedo then opened the "Exhibits Part 1.1.pdf" and "Exhibits Part 1.2.pdf" files from the local drive on the Aedo HP Laptop. (Walton March 2019 Aff. Ex. C, at Lines 265–268.) Less than three minutes later, Aedo opened documents containing Titan's pinch valve price book. (Walton March 2019 Aff. Ex. C, at Lines 263–264.)

38. Aedo also opened "Exhibits Part 1.1.pdf" and "Exhibits Part 1.2.pdf" on February 4, 2019 and accessed Titan sales quotes less than one hour later. (Walton March 2019 Aff. Ex. C, at Lines 369–374.)

39. Similarly, on January 29, 2019, Aedo began working on a quote for a sales representative in Ecuador for a project in Guayaquil, Ecuador.[22] (Walton March 2019 Aff. Ex. C, at Lines 524–533.) Less than one hour later, Aedo opened "Exhibits Part 2.pdf" on the "G drive," (Walton March 2019 Aff. Ex. C, at Lines 522–523), which demonstrates the file was located on an external device connected to the Aedo HP Laptop, (Walton March 2019 Aff. ¶ 14).

40. In total, Aedo opened the P.I. Exhibits on the Aedo HP Laptop from the external "G drive" on *at least forty different occasions*, (Walton March 2019 Aff. ¶ 16), including on November 7, December 5, 10, 11, and 27 in 2018, and on January 2, 4, 11, 18, 25, 28, 29, and 31, and February 4 and 11 in 2019, (Walton March 2019 Aff. ¶ 13; Walton May 2019 Aff. ¶ 17).[23]

D.  Titan Defendants' Further Conduct in Violation of the Court's Orders

41. In addition to Aedo's improper access to and use of Red Valve's Trade Secrets during the pendency of this action, each Titan Defendant violated the Court's orders on numerous occasions.

---

[22] According to Plaintiffs, Aedo's quote for a project in Guayaquil is significant in and of itself, because Plaintiffs recently became aware that Titan is bidding on a project in Guayaquil that it appears Aedo knows about only through his access to Red Valve's Trade Secrets.

[23] Given that Reliance's forensic examination confirms that Defendants continued to access and use Red Valve's Trade Secrets after Plaintiffs notified Defendants' counsel that Defendants continued to hold these confidential documents, it appears to the Court that whatever corrective action Defendants' counsel sought to undertake was insufficient to prevent Defendants from accessing or using the P.I. Exhibits.

### 1. Aedo's Contact with a Current Red Valve Customer[24]

42. Aedo contacted a current Red Valve customer in violation of the March 14, 2018 TRO.

43. As noted, the TRO enjoined Defendants from, among other things, "contacting any of Red Valve's current or known prospective customers identified in Red Valve's Trade Secrets." *Red Valve, Inc.*, 2018 NCBC LEXIS 139, at *7. Defendants' counsel, Gray Layton, accepted service of the TRO on behalf of Defendants, including Aedo, on March 15, 2018. (Pls.' Reply Br. Supp. Mot. Order Show Cause Ex. B, ECF No. 130.1.) Nevertheless, on the very next day, March 16, 2018, Aedo contacted a current Red Valve customer, AMP Mineral, to solicit the company's business for Titan Valve. (*See* Pls.' Br. Supp. Verified Mot. Order Show Cause Ex. A, ECF No. 99.1.) Specifically, Aedo e-mailed an AMP Mineral representative stating, in relevant part, as follows:

> I'm no longer with Red Valve, just like Ben Payne. Starting today we're independent and 100% employees of Red Valve [sic].
>
> The fact is that we're in mediation with Hillenbrand for our departure, and thus I recommend that AMP Minerals not buy directly from Titan until we have a legal agreement with Red Valve. *If you can send the purchase order under another company that would be perfect and the way to proceed.*
>
> . . .
>
> Just confirm for me what type of actuator and I'll give you a firm price.

---

[24] Plaintiffs first raised this issue through their First Show Cause Motion. As discussed below, because Plaintiffs incorporated the conduct underlying the First Show Cause Motion by reference into their Second Sanctions Motion, the Court concludes that it may, and will, consider this conduct when considering appropriate sanctions under the Second Sanctions Motion.

(Pls.' Br. Supp. Verified Mot. Order Show Cause Ex. A (emphasis added).)

44. Defendants do not dispute that Aedo had been served with the TRO when he contacted the AMP Mineral representative, that Aedo was aware that Defendants were enjoined from contacting Red Valve's customers at the time he sent this e-mail, or that AMP Minerals was a current Red Valve customer. Rather, according to Aedo, he sent his e-mail to the AMP Mineral representative "based on [his] belief that Red Valve was preparing a settlement agreement" and that he "did not intend [his] email to be deceitful, nor did [he] intend it to be a violation of any court order." (Aff. Fabian Aedo Ortiz ¶ 16 [hereinafter "Aedo Nov. 2018 Aff."], ECF No. 117.) Regardless of Aedo's claimed lack of intent, his e-mail was in plain violation of the clear and unambiguous language of the TRO.

2. Defendants' Marketing Image Containing Red Valve Trade Secrets[25]

45. The Titan Defendants violated the P.I. Order by using a marketing image that was created using Red Valve's Trade Secrets.

46. As discussed previously, the P.I. Order restrained and enjoined Defendants, "from using, disclosing, or distributing Plaintiffs' . . . Design Documents[.]" *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43.

47. On May 15, 2018, a month after the P.I. Order was entered, Aedo posted an image of a purported Titan valve (the "Marketing Image") to Titan's public LinkedIn profile. (*See* Pls.' Br. Supp. Verified Mot. Order Show Cause Ex. E, ECF No. 99.1.) The valve depicted in the Marketing Image utilized a computer-aided design ("CAD")

---

[25] Plaintiffs first raised this issue through their First Show Cause Motion.

drawing that, in turn, copied a Red Valve sleeve drawing. (*See* Pls.' Br. Supp. Verified Mot. Order Show Cause Exs. B, C, D, E, ECF No. 99.1.) As a result, the valve depicted in the Marketing Image was derived from the Red Valve design drawing of a sleeve.

48. In the P.I. Order, the Court preliminarily found that Red Valve's original sleeve drawing—upon which the CAD drawing was based—constituted a Red Valve Design Document and was thus a trade secret. *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *16–17, *30–31. Moreover, the Court found that the CAD drawing "exactly duplicates the dimensions, labels, and notes" of the Red Valve sleeve drawing.[26] *Id.* at *12.

49. The Titan Valve Defendants do not dispute that the valve depicted in the Marketing Image was derived from Red Valve's sleeve drawing. According to Aedo, however, the Marketing Image "was not the image that [Defendants] intended to be uploaded" to LinkedIn. (Aedo Nov. 2018 Aff. ¶ 18.) Instead, Aedo avers that Defendants intended to upload a different image, one that was not derived from a Red Valve trade secret. (Aedo Nov. 2018 Aff. ¶¶ 19–22.)

50. The Marketing Image was removed from Titan's LinkedIn page on May 17, 2018, two months after the Court's TRO first precluded its use and only after Plaintiffs' counsel's demanded on May 16, 2018 that it be taken down. The Marketing Image was created and publicly disseminated in plain violation of the clear and unambiguous language of the P.I. Order.

---

[26] The CAD drawing had been saved to the "Titan" subfolder in the Dropbox Account.

### 3. Payne's Solicitation and Retention of Red Valve Trade Secrets[27]

51.   Payne violated the P.I. Order by requesting and obtaining Red Valve Trade Secrets from Red Valve employees and failing to return that information to Plaintiffs.

52.   In June 2018—two months after the P.I. Order required Defendants to return all Red Valve property and specifically "**RESTRAINED** and **ENJOINED** [Defendants], during the pendency of this action, from using, disclosing, or distributing Plaintiffs' . . . Design Documents[,]" *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43—Payne visited the personal residence of a Red Valve employee, Brenda Hoffman, and asked her to create a build sheet for a part based on Red Valve's build sheets. (Pls.' Reply Br. Supp. Mot. Order Show Cause Ex. I, at ¶¶ 5–6 [hereinafter "Hoffman Aff."], ECF No. 130.1; *see* Pls.' Br. Supp. Verified Mot. Order Show Cause Ex. L, ECF No. 99.1.)  Ms. Hoffman did not provide Payne with the requested build sheets, but she did tell her Red Valve co-worker, Penny Bates, about her conversation with Payne.  (*See* Hoffman Aff. ¶¶ 7, 9.)

53.   That same month, Ms. Bates met with Payne and gave him a USB drive containing Red Valve build sheets, which Payne accepted (the "Build Sheets USB"). (Aff. Ben Payne ¶¶ 2–3 [hereinafter "Payne Nov. 2018 Aff."], ECF No. 118.)  According to Payne, Ms. Bates "told" him that the Build Sheets USB "contained Red Valve build sheets[.]"  (Payne Nov. 2018 Aff. ¶ 3.)  The P.I. Order specifically provides that Red Valve's build sheets are "Design Documents," and thus Red Valve Trade Secrets, within the meaning of the Order, *see Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *17

---

[27]  Plaintiffs first raised this issue through their First Show Cause Motion.

("Red Valve's Design Documents also include build sheets, which are documents containing a comprehensive listing of the quantity and dimensions of each elastomeric and fabric material used in the hand-fabrication of rubber sleeves and the detailed sequence in which each material is placed on the mandrel and intermediate layers until the final elastomer/fabric matrix is complete."). Reliance subsequently determined that the Build Sheets USB contained over 1,000 Red Valve build sheets. (*See* Pls.' Br. Supp. Mot. Sanctions Ex. L, at ¶ 7 [hereinafter "Walton Nov. 2018 Aff."], ECF No. 92; Payne Nov. 2018 Aff. ¶ 3). Payne did not disclose that he had the Build Sheets USB, or return the USB to Plaintiffs, until October 2018, despite the clear requirements of the P.I. Order. *See Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43. The foregoing conduct violates the plain terms of the P.I. Order.

4. Violations of Return Protocol

a. Aedo's Failure to Certify Compliance

54. After Defendants represented at the December 18, 2018 hearing in this case that the Return Protocol was complete and no further action thereunder was necessary, the Court ordered Defendants to promptly file the certifications of compliance it had initially required to be filed by April 19, 2018 prior to initiating the Return Protocol process.

55. On January 11, 2019, Defendants filed a certification that Jason McCollough of Envista had completed all activities required of Defendants and Envista in the Return Protocol. (Certification Completion Return & Preservation Protocol, ECF No. 140.) Thereafter, on March 5, 2019, Payne for himself and on behalf of Titan, certified that Payne was not aware of any Red Valve property in the

possession of Payne or Titan. (Certification Ben Payne & Titan Valve, ECF No. 164.) Aedo, however, did not file the required certification and remains in violation of the Court's orders to file that certification. He has not explained his ongoing failure to comply with the Court's certification requirement.

b. Failure to Identify Devices and Delete Red Valve Property

56. The Titan Defendants failed to identify at least the following devices in the Return Protocol as devices that may contain Red Valve property, although those devices contained, and may still contain, Red Valve property: (i) the "STORE N GO" USB device containing the Shadow Dropbox; (ii) the Aedo HP Laptop; and (iii) Payne's Lenovo Ideapad.[28] (*See* Return Protocol 2–5.) Such conduct was in violation of the plain language of the Return Protocol.

57. At the time of Payne's March 5, 2019 certification, the P.I. Exhibits, which contain Red Valve property, remained in Payne's Titan e-mail account, Bpayne@Titan-valve.com, as well as on Payne's Lenovo Ideapad. (Walton May 2019 Aff. ¶ 7.) Thus, Payne's certification was false.

58. In addition, as of the date of Reliance's forensic examination under the First Sanctions Order and the Device Discovery Protocol, Payne's Dell laptop contained documents with "Red Valve" in the file name, which should have been returned to

---

[28] In their proposed order on the Second Sanctions Motion, Plaintiffs indicated that the Titan Defendants failed to identify an additional Dropbox account owned by Aedo that was disclosed to Plaintiffs on June 3, 2019 (i.e., the day before June 4 Hearing on the Second Sanctions Motion). Plaintiffs have not offered evidence concerning this additional Dropbox account so the Court does not consider it on the Second Sanctions Motion.

Plaintiffs and deleted under the Return Protocol, but were not, including the following files:

- Red Valve Gross Margin History((Unsaved-306430564229087573)).xlsb
- Red Valve PD – December FY18 – Internal_JMK Slide 15-16_r3_011218.pptx
- Red Valve OEM Agreement – 9-28-2017.docx
- Copy of Project Deck – Red Valve Gastonia.xlsx
- Copy of Red Valve – Dillon 8 11 17 Bid.xlsx
- Red Valve Quartile Detail_2009-2016 – Product Type as Product (1).xlsx
- Copy of 10 27 2016 red valve x matrices and action plan.xlsx
- Copy of 2016 Qrtly Fluctuation Analysis Template – Consolidated Red Valve.xlsx

(Walton March 2019 Aff. ¶ 9; Walton March 2019 Aff. Ex. A.)  It is readily apparent from the file names of these documents that they contain Red Valve property, and Payne was required to return these documents under the Court's orders. Nevertheless, Payne certified—the Court concludes untruthfully—that he was unaware that he continued to possess Red Valve property.  (*See* Certification Ben Payne & Titan Valve, ECF No. 164.)

59.    The Titan Defendants have also failed to locate and produce a number of USB devices that were connected to Payne's Red Valve computer.  Specifically, through Reliance's forensic efforts, Plaintiffs were able to identify nine USB devices that were plugged into Payne's Red Valve computer between October 2017 and March 2018, but which have not been produced or accounted for.  *See Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *25–26.  Payne did not identify any of these USB devices as part of the Return Protocol process, and, in response to Plaintiffs' discovery requests, Payne stated that he no longer possessed any of the missing USB devices.  Despite these assurances, however, on October 23, 2018, Defendants informed Plaintiffs that

they "found" two of the USB drives that had been connected to Payne's computer while he was at Red Valve. *Id.* at *26. Seven USB devices that were connected to Payne's Red Valve computer between October 2017 and March 2018 have yet to be returned to Plaintiffs. *See id.* Based on his conduct to date, the Court is not persuaded that Payne has exhausted all reasonable efforts to locate and return these remaining USB devices to Plaintiffs and thus has violated the Return Protocol and the P.I. Order.

### 5. Violations of Device Discovery Protocol and First Sanctions Order

60. The Titan Defendants also failed to identify and produce at least four data sources under the Device Discovery Protocol in violation of the First Sanctions Order. In particular, Aedo did not identify the "STORE N GO" USB device containing the Shadow Dropbox through the Device Discovery Protocol. (Walton May 2019 Aff. ¶ 20.) Two additional devices, likely a Galaxy J4+ and an Apple iPhone, were connected to the Aedo HP Laptop on January 14, 2019 and February 13, 2019, respectively, and neither was identified by Aedo in the Device Discovery Protocol or provided to Reliance for device discovery. (Walton May 2019 Aff. ¶¶ 21–22.) Similarly, a "My Passport" device was accessed on Aedo's ASUS laptop, but Defendants neither identified nor provided this device to Reliance, as required under the Device Discovery Protocol and First Sanctions Order. (Walton May 2019 Aff. ¶ 27.)

61. By failing to identify and produce these devices—each of which Defendants used on or after July 1, 2017 and which were to be subject to forensic examination

under the Device Discovery Protocol—the Titan Defendants violated the First Sanctions Order.

### 6. Defendants Concealed Evidence from Discovery Responses

62. By Order dated March 15, 2019, the Court ordered Defendants to respond to certain discovery requests, including Interrogatory No. 14 in Plaintiffs' First Set of Interrogatories, which requested that Defendants "[l]ist all Red Valve Trade Secrets that You have used or disclosed for any purpose other than for Defendants' Payne or Aedo's employment with Red Valve[.]" (Order Pls.' BCR 10.9 Dispute Summaries 6–7, ECF No. 172.) In their April 3, 2019 response to Interrogatory No. 14, however, Defendants listed conduct only up to and including March 11, 2018 (i.e., prior to the filing of Plaintiffs' Complaint in this action). By failing to identify the Trade Secrets in the P.I. Exhibits and the Shadow Dropbox Price Data (which Aedo used to advance Titan's business interests after Plaintiffs' Complaint was filed), the Titan Defendants failed to comply with the Court's March 15, 2019 Order and frustrated the process of substantive discovery on the merits of Plaintiffs' claims.

### E. Second Sanctions Motion

63. Plaintiffs filed the Second Sanctions Motion on March 13, 2019. That same day, the Court held a telephone conference to preliminarily address the issues raised in the Second Sanctions Motion. All parties that have appeared in this action were represented by counsel at the conference.

64. On March 14, 2019, the Court issued a Preliminary Order on Plaintiffs' Motion for Sanctions (the "Preliminary Second Sanctions Order"). (Prelim. Order Pls.' Mot. Sanctions, ECF No. 171.) In light of the substantial evidence offered by

Plaintiffs showing that Aedo continued to use the P.I. Exhibits for months after the P.I. Order had issued and continued to then have access to that confidential Red Valve information, the Court concluded that immediate relief was warranted. Specifically, the Court, in the exercise of its discretion and for good cause shown, concluded that Plaintiffs' forensic expert, Reliance, should be permitted to conduct a forensic examination of all of Defendants' data sources—regardless of whether such data sources were subject to the Return Protocol or Device Discovery Protocol—to search for and identify data and metadata related to the P.I. Exhibits. The Court directed Reliance to "permanently delete from the Data Sources the P.I Exhibits and any copies thereof[.]" (Prelim. Order Pls.' Mot. Sanctions 3–4.)

65. Through the Preliminary Second Sanctions Order, the Court also directed Defendants to each certify under oath in a written statement filed with the Court by no later than March 19, 2019 that, among other things, "the Defendant ha[d] not viewed, accessed, used, or disclosed the P.I. Exhibits at least since March 11, 2019" and "the Defendant ha[d] returned any and all hard copies of the P.I. Exhibits (or any other information or material that the Court identified as a Red Valve trade secret in the [P.I. Order]) that [were] within Defendants' possession, custody or control[.]" (Prelim. Order Pls.' Mot. Sanctions 4–5.) The Court further noted that, "[c]onsistent with the Court's prior orders in this case, Defendants [were] prohibited from using, possessing, or disclosing the P.I. Exhibits (or any other information or material that the Court identified as a Red Valve trade secret in the [P.I. Order])." (Prelim. Order Pls.' Mot. Sanctions 2–3.)

66.     Farris, Payne, and Titan timely filed sworn certifications pursuant to the Preliminary Second Sanctions Order.  Aedo, on the other hand, filed an unsworn certification on March 19, 2019 and did not file a notarized certification until June 3, 2019 (i.e., the day prior to the June 4 Hearing on the Second Sanctions Motion).

67.     In accordance with the Preliminary Second Sanctions Order, Reliance deleted the P.I. Exhibits from Defendants' tendered devices.  (Walton May 2019 Aff. ¶¶ 7–9.)

68.     The Court heard arguments on the Second Sanctions Motion at the June 4 Hearing, at which all parties that have appeared in this action were represented by counsel.

69.     At the conclusion of the June 4 Hearing, the Court forecast that it would grant the Second Sanctions Motion, at least to the extent Plaintiffs seek sanctions against Aedo and Titan.  The Court declined, however, to forecast its ruling as to Payne.

70.     In light of the Court's forecasted ruling that at least Aedo and Titan would be ordered to pay Plaintiffs' reasonable expenses, including attorneys' fees, the Court set a schedule at the June 4 Hearing for filing and briefing Plaintiffs' anticipated petition for such fees.  On June 18, 2019, Plaintiffs filed a Petition for Reasonable Expenses Resulting from Plaintiffs' Second Motion for Sanctions (the "Fee Petition"). Briefing is complete on the Fee Petition, and the Court will rule on the Petition by separate order.

71.     The Second Sanctions Motion is now ripe for final determination.

## II.

## CONCLUSIONS OF LAW

72. Plaintiffs request that the Court impose sanctions pursuant to the Court's inherent authority and under Rules 11, 26, 37, and 41 of the North Carolina Rules of Civil Procedure. Plaintiffs specifically ask the Court to (i) strike the Titan Defendants' Answer to Plaintiffs' Amended Complaint and enter default against them; (ii) modify the Return Protocol; (iii) require the Titan Defendants to pay Plaintiffs' reasonable expenses incurred in bringing the Second Sanctions Motion, including payment of Plaintiffs' reasonable attorneys' fees; and (iv) modify the Protective Order entered in this case. While the Titan Defendants do not dispute that sanctions may be appropriate or that the Court has the authority to enter the sanctions Plaintiffs request, they contend that "[t]he sanctions sought by Plaintiffs are excessive and unwarranted under the circumstances." (Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt 8, ECF No. 196.)

73. Before considering the Second Sanctions Motion on its merits, the Court addresses the suggestion first raised by the Titan Defendants at the June 4 Hearing that sanctions against Payne are improper because he did not receive adequate notice of the grounds upon which sanctions against him are sought.

74. As an initial matter, it is well established that "[t]he bases for the sanctions must be alleged" and, "[i]n order to pass constitutional muster, the person against whom sanctions are to be imposed must be advised in advance of the charges against him." *Walsh v. Cornerstone Health Care, P.A.*, No. COA18-925, 2019 N.C. App.

LEXIS 503, at \*11–12 (N.C. Ct. App. June 4, 2019) (quoting *Griffin v. Griffin*, 348 N.C. 278, 280, 500 S.E.2d 437, 439 (1998)). Contrary to Payne's contention, however, Plaintiffs' Second Sanctions Motion, and the briefs and materials submitted in support, easily met this standard and afforded Payne fair and adequate notice of the bases for the sanctions sought against him.

75. In particular, Plaintiffs incorporated by reference the conduct underlying the First Show Cause Motion (and thus Payne's conduct related to the Build Sheets USB) into the Second Sanctions Motion. (*See* Pls.' Br. Supp. Second Mot. Sanctions & Contempt 10, ECF No. 169 ("Plaintiffs refer the Court back to Plaintiffs' prior Motion for Sanctions and Motion for Order to Show Cause for a full recitation of Defendants' truly reprehensible conduct.").) Further, Plaintiffs specifically described Payne's failure to timely identify and produce certain devices in the Return Protocol. (*See* Pls.' Br. Supp. Second Mot. Sanctions & Contempt 12 ("Defendants belatedly identified two USB devices in Defendant Payne's possession that should have been subject to the Return Protocol[.]").) Finally, Plaintiffs pointed out that the Forensic Reports generated through the Device Discovery Protocol showed that Red Valve property remained on Payne's laptop even after the Return Protocol process was completed. (*See* Pls.' Br. Supp. Second Mot. Sanctions & Contempt 13 ("[A] search of 'Red Valve' on the master file table for Defendant Payne's Dell Laptop reveals documents that are Red Valve Property, which is readily apparent by the file names.").) Therefore, the Court concludes that the Titan Defendants' arguments are

without merit and that Payne had adequate notice of his conduct at issue in the Second Sanctions Motion.

76. The Court thus turns to the merits of the Second Sanctions Motion.

77. Trial courts retain the inherent authority "to do all things that are reasonably necessary for the proper administration of justice." *Beard v. N.C. State Bar*, 320 N.C. 126, 129, 357 S.E.2d 694, 696 (1987). "[T]he power to sanction disobedient parties, even to the point of dismissing their actions or striking their defenses, . . . is longstanding and inherent." *Minor v. Minor*, 62 N.C. App. 750, 752, 303 S.E.2d 397, 399 (1983); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (holding that statutory schemes and court rules do not "displace[] the inherent power to impose sanctions for . . . bad-faith conduct," for statutory schemes and court rules, even when considered together, "are not substitutes for . . . inherent power"); *Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 674, 360 S.E.2d 772, 776 (1987) ("[W]e hold it to be within the inherent power of the trial court to order plaintiff to pay defendant's reasonable costs including attorney's fees for failure to comply with a court order."); *Cloer v. Smith*, 132 N.C. App. 569, 573, 512 S.E.2d 779, 782 (1999) ("The trial court . . . retains inherent authority to impose sanctions for discovery abuses beyond those enumerated in Rule 37."); *Few v. Hammack Enters., Inc.*, 132 N.C. App. 291, 298–99, 511 S.E.2d 665, 670–71 (1999) (finding it was within the trial court's inherent authority to strike a party's answer for willful failure to comply with the rules of court); *Lomax v. Shaw*, 101 N.C. App. 560, 563, 400 S.E.2d 97, 98 (1991) (concluding trial court "was well within the bounds of the court's inherent authority

to manage the case docket when he struck the defendants' answer" for failing to execute a consent judgment).

78.     Separate and apart from a trial court's inherent authority to impose sanctions, Rule 37(b) of the North Carolina Rules of Civil Procedure permits a court to order a variety of sanctions against a party who fails to obey a court order regarding discovery.  *See* N.C. R. Civ. P. 37(b); *Bumgarner v. Reneau*, 332 N.C. 624, 630, 422 S.E.2d 686, 690 (1992) ("Rule 37 establishes certain sanctions for failure of a party to comply with discovery processes."); *see also Essex Grp., Inc. v. Express Wire Servs.*, 157 N.C. App. 360, 363, 578 S.E.2d 705, 707 (2003) ("Rule 37 sanctions are powers granted to the trial courts of our state to prevent or eliminate dilatory tactics on the part of unscrupulous attorneys or litigants."); *Am. Tel. & Tel. Co. v. Griffin*, 39 N.C. App. 721, 727, 251 S.E.2d 885, 888 (1979) ("[T]he discovery rules should be constructed liberally so as to substantially accomplish their purposes.  The administration of these rules lies necessarily within the province of the trial courts; Rule 37 allowing the trial court to impose sanctions is flexible, and a broad discretion must be given to the trial judge with regard to sanctions." (citations and quotation marks omitted)); *Out of the Box Developers, LLC v. LogicBit Corp.*, 2014 NCBC LEXIS 7, at *7 (N.C. Super. Ct. Mar. 20, 2014) (concluding that Rule 37(b) may be used to sanction a party for violating a Rule 26(c) protective order because "the orderly and efficient progression of litigation demands that the trial court be empowered to police violations of [discovery] orders").  Permissible sanctions under Rule 37(b) include, but

are not limited to, the establishment of facts, the exclusion of evidence, the striking out of pleadings or parts thereof, or the dismissal of an action. N.C. R. Civ. P. 37(b)(2).

79. The imposition of sanctions is left to the sound discretion of the trial judge and "will not be overturned absent a showing of abuse of discretion." *Cloer*, 132 N.C. App. at 573, 512 S.E.2d at 782. A trial court will be held to have abused its discretion only "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *E. Brooks Wilkins Family Med., P.A. v. WakeMed*, 244 N.C. App. 567, 578, 784 S.E.2d 178, 185 (2016) (quoting *Couch v. Private Diagnostic Clinic*, 146 N.C. App. 658, 667–68, 554 S.E.2d 356, 363 (2001)).

80. "North Carolina courts do not presently require the party requesting sanctions to demonstrate, as a part of its burden, that it suffered prejudice as a result of the opposing party's discovery failures or that the opposing party acted willfully." *Tumlin v. Tuggle Duggins P.A.*, 2018 NCBC LEXIS 51, at *31 (N.C. Super. Ct. May 22, 2018); *see Henderson v. Wachovia Bank of N.C., N.A.*, 145 N.C. App. 621, 629, 551 S.E.2d 464, 470 (2001). That said, "[w]illfulness, bad faith, or prejudice to another party" may influence the court's discretion "in determining the appropriate sanction." *Out of the Box Developers, LLC*, 2014 NCBC LEXIS 7, at *9.

81. In assessing appropriate sanctions, North Carolina law is clear that a court may consider the entire record before it. *See Ray v. Greer*, 212 N.C. App. 358, 363, 713 S.E.2d 93, 97 (2011) (noting that trial court may "view of the totality of the circumstances of the case" in assessing appropriate sanctions (quoting *Badillo v.*

*Cunningham*, 177 N.C. App. 732, 734–35, 629 S.E.2d 909, 911 (2006))); *Batlle v. Sabates*, 198 N.C. App. 407, 420, 681 S.E.2d 788, 797–98 (2009) (affirming trial court's dismissal of plaintiff's complaint as a sanction where trial court considered "the totality of the circumstances of the case in determining the appropriate sanction" (internal quotation marks omitted)). Indeed, "[w]hen sanctioning a party under its inherent authority, the court must weigh the circumstances of each case and choose a sanction that, in the court's judgment, 'properly takes into account the severity of the party's disobedience.'" *Out of the Box Developers, LLC*, 2014 NCBC LEXIS 7, at *10 (quoting *Patterson v. Sweatt*, 146 N.C. App. 351, 357, 553 S.E.2d 404, 409 (2001)).

82. Finally, in determining whether the issuance of serious sanctions pursuant to a court's inherent authority is proper, the North Carolina Supreme Court has looked to guidance from federal courts. *See Daniels*, 320 N.C. at 674, 360 S.E.2d at 776. The United States Court of Appeals for the Fourth Circuit, in a panel joined by former North Carolina Business Court Judge Albert Diaz, has held that serious sanctions, including the dismissal of an action, "are appropriate when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013) (citations and quotation marks omitted). The Court finds *Project Management*'s articulation persuasive and appropriate for application in this case.

83. Here, the primary grounds upon which Plaintiffs' base the Second Sanctions Motion are (i) Aedo's access to and use of Red Valve's Price Data through the Shadow

Dropbox and (ii) Aedo's access to and use of the P.I. Exhibits. Plaintiffs also assert that sanctions are warranted as a result of the Titan Defendants' other violative conduct, including the conduct first raised in Plaintiffs' First Show Cause Motion involving Aedo and Payne.

A.    Aedo's Sanctionable Conduct

84.    Aedo's conduct during the pendency of this action, for himself and on behalf of Titan, reflects an astonishing disregard for the judicial process and the Court's orders, an utter defiance of the law and Aedo's legal responsibilities as a party in this litigation, and a total disdain for the administration of justice under the laws of this State. As such, the Court concludes that severe sanctions against Aedo and Titan are appropriate.

85.    Particularly, Aedo, in his individual capacity and as an agent of Titan, has violated the Court's various orders and engaged in litigation misconduct in at least the following ways:

- Contacting a Red Valve customer, AMP Mineral, on March 16, 2018 in violation of the TRO;

- Creating the Shadow Dropbox containing Red Valve's Price Data on March 16, 2019 in violation of the TRO;

- Withholding responsive documents and concealing material, adverse evidence in violation of the Expedited Discovery Order;

- Signing an affidavit submitted in opposition to Plaintiffs' P.I. Motion, in which he falsely claimed that he did not have access to any of Red Valve's pricing information and that he no longer had access to that Dropbox Account or any information contained therein;

- Accessing Red Valve's Price Data through the Shadow Dropbox on at least April 13, 2018 and September 12, 2018 in violation of the P.I. Order;

- Failing to identify the "STORE N GO" USB drive containing the Shadow Dropbox in response to relevant, appropriate written discovery;

- Accessing the P.I. Exhibits at least forty separate times, each of which is a distinct violation of the P.I. Order;

- Posting the Marketing Image to Titan's public LinkedIn page on May 15, 2018 in violation of the P.I. Order;

- Failing to return and delete all Red Valve property within the agreed-upon deadlines in the Return Protocol;

- Failing to file a certification concerning his compliance with the Return Protocol as required by the P.I. Order and the Order Clarifying P.I.;

- Failing to identify and produce at least the following devices in the Return Protocol as required by its terms: (i) the Aedo HP Laptop and (ii) the "STORE N GO" USB drive containing the Shadow Dropbox;

- Failing to timely file a sworn certification as required under the Device Discovery Protocol in defiance of the Court's February 12, 2019 Order denying Aedo's motion for extension;

- Failing to timely submit to Reliance all data sources as required under the Device Discovery Protocol in defiance of the Court's February 12, 2019 Order denying Aedo's motion for extension;

- Failing to identify and produce at least the following devices in the Device Discovery Protocol as required by the terms of the Protocol and the Court's First Sanctions Order: (i) a Galaxy J4+ connected to the Aedo HP Laptop on February 13, 2019; (ii) an Apple iPhone connected to the Aedo HP Laptop on January 14, 2019; (iii) a "My Passport" device accessed on Aedo's ASUS laptop; and (iv) the "STORE N GO" USB drive containing the Shadow Dropbox;

- Failing to identify the Trade Secrets in the P.I. Exhibits and Shadow Dropbox in his response to Plaintiffs' Interrogatory No. 14 as required under the Court's March 15, 2019 Order; and

- Failing to timely file a sworn certification as required under the Preliminary Second Sanctions Order.

86. The Court has identified above sixty-one discrete instances of Aedo's failure to comply with the legal duties imposed by the Court's orders and applicable law, which individually and collectively reflect Aedo's utter disregard for the Court's authority and the legal process. The Court concludes that serious sanctions are appropriate to address Aedo's litigation misconduct.

87. Of particular significance for purposes of the Second Sanctions Motion are Aedo's repeated violations of the TRO and P.I. Order through his separate use of the Shadow Dropbox and the P.I. Exhibits, which were only discovered in 2019 through the Device Discovery Protocol, itself necessitated by Defendants' earlier misconduct. This specific conduct bears special mention, and each set of actions, standing alone, justifies the imposition of the harshest sanctions.

1. <u>Aedo's Access to and Use of Red Valve Price Data Through the Shadow Dropbox</u>

88. The Court turns first to Aedo's access to and use of Red Valve's Price Data through the Shadow Dropbox for the benefit of the Titan Defendants. The March 14, 2018 TRO "restrained and enjoined [Defendants] from directly or indirectly using, disclosing, relying on, or otherwise misappropriating Red Valve's Trade Secrets" and ordered Defendants to "return to Red Valve any and all Red Valve property in their possession." *Red Valve, Inc.*, 2018 NCBC LEXIS 139, at \*5–7. The Court preliminarily found that Red Valve's Price Data, or the "prices Red Valve charges for its products and the formula it uses to price products," was a Red Valve Trade Secret. *Id.* at \*5.

89. Reliance's forensic examination conclusively establishes that only two days after the TRO was entered, Aedo improperly accessed the Dropbox Account and downloaded Red Valve's Price Book and a Red Valve price factor sheet to the Shadow Dropbox he had recently created. Both documents indisputably constitute Price Data and thus are Red Valve Trade Secrets under the TRO, and the Court concludes that Aedo's conduct in accessing and downloading these materials was a gross and willful violation of the TRO.

90. Moreover, two weeks after he created the Shadow Dropbox and downloaded Red Valve's Price Data, Aedo offered in opposition to the P.I. Motion an affidavit in which he falsely swore, among other things, that he did not "take any pricing list" when "leaving [his] employment with Red Valve," (Aedo April 2018 Aff. ¶ 13), and that he "no longer [had] access to that Dropbox account (or the Titan folder), or any information contained therein[,]" (Aedo April 2018 Aff. ¶ 30). It is plain from the now-developed record that Aedo knew his representations were false when he made them and intended those representations to conceal from Plaintiffs and the Court that he had accessed and used, and intended to continue to access and use, Red Valve's Trade Secrets to further Titan's business.

91. Thereafter, on April 10, 2018, the Court granted Plaintiffs' P.I. Motion, and through the P.I. Order again "**RESTRAINED** and **ENJOINED**" Defendants "from using, disclosing, or distributing Plaintiffs' . . . Price Data" and required that Defendants return all Red Valve property. *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at

*43. Three days later, Aedo accessed the Price Data in the Shadow Dropbox in blatant violation of the P.I. Order.

92. On September 12, 2018, Aedo again violated the P.I. Order by accessing the Price Data in the Shadow Dropbox. On this occasion, Aedo's access to the Price Data was contemporaneous with his access to documents related to Titan's pricing, including a "Titan Price Book." Based on the evidence of record, the Court concludes that Aedo accessed and used Red Valve's proprietary Price Data on this occasion to further Titan's business objectives in plain violation of the Court's P.I. Order.

93. In the face of this evidence, Aedo offers little by way of defense or justification for his conduct. At the June 4 Hearing, Aedo's counsel represented that Aedo purports to have "no recollection" of creating the Shadow Dropbox or accessing Red Valve's Price Data. The Reliance forensic examination, however, conclusively establishes that he did just that. Aedo does not otherwise challenge the results of Reliance's forensic examination showing that he saved the Price Data to the Shadow Dropbox and repeatedly accessed those files.

94. Based on the above, the Court concludes that Aedo's conduct in connection with the Shadow Dropbox as outlined above was in willful violation of the Court's P.I. Order and, by itself, merits the imposition of severe sanctions against Aedo and Titan.

    2. Aedo's Access to and Use of P.I. Exhibits

95. The Court turns next to Aedo's access to and use of the P.I. Exhibits for the benefit of the Titan Defendants. Although Aedo does not challenge the evidence showing that he accessed the P.I. Exhibits containing Red Valve's Trade Secrets *over*

*forty separate times* from September 2018 through February 2019, he contends that his conduct was justified and should not lead to the imposition of severe sanctions.

96. The Titan Defendants first argue that "the highly unusual circumstances of how Defendants received the" P.I. Exhibits justifies Aedo's conduct. (Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt 9, ECF No. 196.) To this end, Aedo avers that he thought he could access Red Valve's P.I. Exhibits because a Gray Layton employee sent those documents to Defendants. Aedo asserts that "[u]p until the time [he] learned about Plaintiffs' allegations in the Second Sanctions Motion, [he] believed that [he] was permitted to have and access the [P.I. Exhibits], because they were provided to [him] and the other members of Titan Valves [sic] by our former attorneys." (Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt Ex. 3, at ¶ 8 [hereinafter "Aedo April 2019 Aff."], ECF No. 196.1.)

97. The Supreme Court of North Carolina has held that a litigant's good faith reliance on an attorney's advice "concerning the legal basis for their claim" may preclude Rule 11 sanctions. *Bryson v. Sullivan*, 330 N.C. 644, 660, 412 S.E.2d 327, 335–36 (1992). In that context, the Court defined "good faith as 'honesty of intention, and freedom from knowledge of circumstances which ought to put [one] upon inquiry.'" *Id.* at 662, 412 S.E.2d at 336 (quoting Black's Law Dictionary 693 (6th ed. 1990)). *Bryson*, however, does not provide a path for Aedo to avoid the consequences of his conduct here.

98. To the contrary, the evidence of record shows that Aedo was not acting in good faith reliance on the advice of counsel and could not reasonably believe that he

could possess, access, or use the P.I. Exhibits, and specifically Red Valve's Price Book, in the face of the plain and unambiguous Court orders precluding such conduct. In particular, the P.I. Order unequivocally provided that Defendants were "**RESTRAINED** and **ENJOINED**, during the pendency of this action, from using, disclosing, or distributing Plaintiffs' . . . Price Data[.]" *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at \*43. The Titan Defendants do not dispute that they received the P.I. Order, nor do they argue either that they misunderstood the P.I. Order or that Red Valve's Price Book did not constitute Price Data under its terms. Moreover, each Defendant, including Aedo was fully aware that Plaintiffs had fired and sued them for downloading Red Valve's Trade Secrets and other proprietary information and that the Court had granted injunctive relief *twice* to prevent the use of Red Valve's confidential information and require the prompt return of Red Valve's property. When these facts are considered with Aedo's surreptitious creation and use of the Shadow Dropbox in willful violation of the TRO—an effort to conceal showing that he knew his conduct was improper—Aedo's claim that he thought he could use the Price Book rings hollow indeed.

99. The Titan Defendants also seek to minimize Aedo's conduct by contending that there is a "lack of evidence that Defendants in fact used the [P.I. Exhibits] to compete against Plaintiffs." (Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt 9.) Although Aedo acknowledges that he accessed Red Valve's Price Book while working on Titan's price book, he avers that it was "not for the purpose of using any of the pricing information itself." (Aedo April 2019 Aff. ¶ 10.) Instead, Aedo claims

that he accessed the Price Book "once" because he "simply wanted to be sure that Titan's price book looked stylistically different from Red Valves [sic], to emphasize that Titan had developed its pricing independently." (Aedo April 2019 Aff. ¶ 10.)

100.   Aedo's explanation does not square with the undisputed facts. In particular, Reliance's forensic examination shows that on numerous occasions—not just "once"—Aedo accessed the Red Valve Price Book at or about the same time he accessed the Titan price book or other Titan pricing-related information. For example, on February 11, 2019, Aedo accessed files containing quote activities for Titan from 11:20 AM to 11:30 AM on the Aedo HP Laptop. (Walton March 2019 Aff. Ex. C, at Lines 269–274.) Seventeen minutes later, at 11:47 AM, Aedo opened the "Exhibits Part 1.1.pdf" and "Exhibits Part 1.2.pdf" files from the local drive on the Aedo HP Laptop, i.e., the P.I. Exhibits. (Walton March 2019 Aff. Ex. C, at Lines 265–268.) Less than three minutes later, Aedo opened documents containing Titan's pinch valve price book. (Walton March 2019 Aff. Ex. C, at Lines 263–264.) Aedo's explanation hardly accounts for this conduct. To the contrary, the Court concludes that this and the other evidence before the Court shows that Aedo repeatedly used the Red Valve Price Book to make Titan pricing decisions in direct violation of the P.I. Order.

101.   The Titan Defendants also suggest that Aedo's conduct is inconsequential (and thus should not justify sanctions) because Titan later abandoned its plans to manufacture and sell products designed by Titan. This argument fails for at least two reasons.

102. First, and most importantly, the fact that a violator elects to make post-violation business decisions that limit the benefit obtained from his violative conduct cannot insulate the violator for the consequences of his misconduct. It is the violator's abuse and undermining of the judicial process and his interference with the orderly administration of justice that is paramount in imposing sanctions, not whether the violator gained from his misconduct. *See Projects Mgmt. Co.*, 734 F.3d at 373.

103. In any event, Titan's alleged change in business plans did not eliminate any benefit to Titan from Aedo's actions as the Titan Defendants suggest. Although Aedo avers that "Titan became a distributor for Dual Valves [("Dual")] and abandoned its plans to manufacture and sell Titan designs" in February 2019, (Aedo April 2019 Aff. ¶ 10), and further that "Titan does not control the pricing that Dual sets on its products[,]" (Aedo April 2019 Aff. ¶ 11), the evidence shows that Aedo regularly communicated with Dual about pricing Dual products, (Pls.' Reply Br. Supp. Second Mot. Sanctions & Contempt Ex. B, ECF No. 204.1), and that Titan was in the process of finalizing a Products Distribution and Manufacturing Agreement to manufacture and distribute parts on behalf of Dual during the same time Aedo was routinely using Red Valve's Price Book contained in the P.I. Exhibits, (*see* Pls.' Reply Br. Supp. Second Mot. Sanctions & Contempt Ex. C, ECF No. 204.1).[29] Based on this evidence, the Court finds the Titan Defendants' contention unpersuasive.

---

[29] The Product Distribution and Manufacturing Agreement between Titan and Dual provides that "Titan may charge End User *any cost that Titan Designates*." (Pls.' Reply Br. Supp. Second Mot. Sanctions & Contempt Ex. C, ECF No. 204.1 (emphasis added).)

104. Finally, the Titan Defendants contend that Aedo accessed the P.I. Exhibits for litigation purposes, "such as reminding himself of the specific allegations in Red Valve's affidavits in order to respond to discovery requests," (Defs.' Br. Opp'n Pls.' Second Mot. Sanctions & Contempt 4), not to advance Titan's business interests. The undisputed facts again do not support Aedo's claim. In particular, Reliance's forensic examination shows that Aedo did not access any litigation-related documents immediately prior to or immediately after any of the times Aedo accessed the Red Valve Price Book in the P.I. Exhibits. As such, Aedo's explanation lacks all credibility.

105. Accordingly, based on the above, the Court concludes that the overwhelming weight of evidence shows that Aedo accessed and used the P.I. Exhibits containing Red Valve's Trade Secrets, and specifically Red Valve's Price Book, over forty separate times from September 2018 through February 2019 to advance Titan's business interests and to compete against Red Valve in knowing and willful violation of the Court's P.I. Order. The Court concludes that such conduct, particularly when considered with Aedo's other conduct discussed above, merits the imposition of severe sanctions against Aedo and Titan.

B.  Payne's Sanctionable Conduct

106. Although not as egregious as Aedo's, Payne's conduct nonetheless demonstrates a complete disregard for the proper administration of justice, has "undermine[d] the integrity of the process," *Projects Mgmt. Co.*, 734 F.3d at 373, and warrants severe sanctions.

107. Payne, in his individual capacity and as an agent of Titan, has violated the Court's various orders and engaged in litigation misconduct in at least the following ways:

- Soliciting and retaining the Build Sheets USB in violation of the P.I. Order;

- Withholding responsive documents and concealing material adverse evidence in violation of the Expedited Discovery Order;

- Failing to identify and produce the Build Sheets USB as required under the Return Protocol;

- Failing to identify and produce his Lenovo Ideapad as required under the Return Protocol;

- Failing to timely identify and produce two additional USB devices in his possession as required under the Return Protocol; and

- Failing to return and delete all Red Valve property within the agreed-upon deadlines established in the Return Protocol.

108. In particular, the undisputed facts of record show that shortly after the Court entered the P.I. Order, and while the parties were negotiating the Return Protocol, Payne actively sought to obtain Red Valve's Trade Secrets in total disregard of the clear and unambiguous restrictions set forth in the P.I. Order. As noted previously, that Order, like the TRO, required Defendants to return all Red Valve property and specifically "**RESTRAINED** and **ENJOINED** [Defendants], during the pendency of this action, from using, disclosing, or distributing Plaintiffs' . . . Design Documents[.]" *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43. For purposes of the P.I. Order, Design Documents included, among other things, Red Valve's "build sheets." *Id.* at *17.

109. As explained in more detail above, in June 2018—two months after the P.I. Order issued—Payne sought and obtained from Red Valve employees the Build Sheets USB, which he knew contained over 1,000 Red Valve build sheets. (Walton Nov. 2018 Aff. ¶ 7; Payne Nov. 2018 Aff. ¶ 3.) Although Payne knew that the Build Sheets USB contained Red Valve Trade Secrets, (*see* Payne Nov. 2018 Aff. ¶ 3), he did not identify the Build Sheets USB in connection with the ongoing Return Protocol and did not turn over the USB to Plaintiffs until late October 2018, (*see* Pls.' Br. Supp. Verified Mot. Order Show Cause Ex. L). Indeed, after receiving the Build Sheets USB, Payne did not disclose its existence for over five months, and only identified the USB when confronted with the prospect of forensic discovery of his devices that would most certainly have exposed the existence of the Build Sheets USB to Plaintiffs and the Court.[30]

110. To justify his conduct, Payne avers that "it did not occur to [him] that the [Build Sheets USB] needed to be handed over to [his] lawyers and returned" because "[t]he deadlines to return tangible items under the [P.I. Order] had already passed, and [he] had already provided [his] lawyers with [his] devices and documents." (Payne Nov. 2018 Aff. ¶ 4.) The Court cannot credit Payne's explanation, especially given that Payne asked Ms. Hoffman to create a build sheet for him based on Red Valve's Trade Secrets shortly after the P.I. Order issued. Accordingly, the Court concludes that Payne's conduct as discussed above was in willful violation of the Court's P.I. Order and Return Protocol and, standing alone, as well as when

---

[30] Defendants disclosed the existence of the Build Sheets USB four days after Bell, Davis & Pitt, P.A. appeared as counsel of record.

considered in conjunction with Payne's other willful violations identified above, justifies the imposition of severe sanctions.

C.    Appropriate Sanctions

111.  The Court next considers appropriate sanctions for the Titan Defendants' egregious misconduct.  Plaintiffs ask the Court to (i) strike the Titan Defendants' Answer to Plaintiffs' Amended Complaint and enter default against them; (ii) modify and re-conduct the Return Protocol to locate and return Plaintiffs' Trade Secrets and other property; (iii) require the Titan Defendants to pay Plaintiffs' reasonable expenses incurred in bringing the Second Sanctions Motion, including payment of Plaintiffs' reasonable attorneys' fees; and (iv) modify the Protective Order entered in this case to exclude Defendants' former counsel's access to certain information.

112.  The Titan Defendants do not dispute that the Court has the inherent authority to order all the sanctions Plaintiffs now seek.  Nor do the Titan Defendants dispute that certain sanctions may be appropriate.  The Titan Defendants request only that the Court exercise its discretion and decline to grant Plaintiffs' request for dispositive relief.

1.    Strike Titan Defendants' Answer

113.  Plaintiffs seek as a sanction an order striking the Titan Defendants' Answer and entering default against them.  The Titan Defendants respond that lesser sanctions are warranted due to certain supposedly mitigating circumstances.  After careful consideration of the Titan Defendants' conduct discussed above and the potential application of lesser available sanctions, the Court, in the exercise of its discretion and pursuant to its inherent authority and the authority conferred by Rule

37(b), concludes that the Titan Defendants' Answer should be stricken and default should be entered against each of them on all claims as an appropriate sanction for the Titan Defendants' misconduct. The Court has considered lesser sanctions—including, among other things, striking certain affirmative defenses, striking the Answer of one Titan Defendant but not of all Titan Defendants, deeming certain facts to be established, refusing to allow the Titan Defendants to oppose certain claims, prohibiting the Titan Defendants from introducing certain evidence, and holding one or more of the Titan Defendants in civil or criminal contempt—and concludes, in the exercise of its discretion, that a lesser sanction would not serve the interests of justice in the facts and circumstances of this case. None of these alternative sanctions adequately addresses the nature of the Titan Defendants' misconduct, including their ongoing and continued violations of this Court's orders.

114. The Court is mindful that "striking a party's answer is a severe sanction which should only be imposed where the trial court has considered less severe sanctions and found them to be inappropriate." *Few*, 132 N.C. App. at 299, 511 S.E.2d at 671 (citing *Triad Mack Sales & Serv. v. Clement Bros. Co.*, 113 N.C. App. 405, 409, 438 S.E.2d 485, 488 (1994)); *see* N.C. R. Civ. P. 37(b)(2)(b)–(c); *Rodriguez v. Beckwith*, No. COA15-1021, 2016 N.C. App. LEXIS 532, at *1–2, *5–6 (N.C. Ct. App. May 17, 2016). Moreover, "[i]mposition of sanctions that are directed to the outcome of the case, such as dismissals, default judgments, or preclusion orders, . . . are examined in the light of the general purpose of the Rules to encourage trial on the merits." *Moore v. Mills*, 190 N.C. App. 178, 180–81, 660 S.E.2d 589, 591 (2008) (quoting *Am.*

*Imps., Inc. v. G. E. Emps. W. Region Fed. Credit Union*, 37 N.C. App. 121, 124, 245 S.E.2d 798, 800 (1978)); *cf. Essex Grp., Inc.*, 157 N.C. App. at 363, 578 S.E.2d at 708 (affirming sanctions order striking defendants' answer, entering default judgment, and ordering defendants to pay plaintiff's costs and attorneys' fees under Rule 37 where defendants' actions "were at best dilatory and at worst dishonest"); *Patterson*, 146 N.C. App. at 358–59, 553 S.E.2d at 409–10 (affirming dismissal of action with reasonable costs and attorneys' fees for, *inter alia*, multiple violations of court orders on discovery).

115. On the evidence of record here, as more particularly discussed above, the Court concludes that the Titan Defendants have knowingly and willfully "deceive[d] [the] court" by filing false affidavits concealing their misconduct; "abuse[d] the process at a level that is utterly inconsistent with the orderly administration of justice" by using Red Valve Trade Secrets they improperly obtained through this litigation to advance Titan's business interests and by failing to adhere to the Court's various orders concerning the identification, preservation, and return of Plaintiffs' Trade Secrets and other property; and "undermine[d] the integrity of the [judicial] process" by violating the Court's P.I. Order and related orders prohibiting Defendants from using Red Valve's trade secret information and requiring the return of Red Valve's property while the parties litigated the merits of Plaintiffs' claims. *See Projects Mgmt. Co.*, 734 F.3d at 373. As a result, the Court concludes that striking the Titan Defendants' Answer is the most appropriate sanction here.

116. The Court has considered lesser sanctions and determined that lesser sanctions are not sufficient in light of the Titan Defendants' prior and ongoing violations of the Court's orders and their various misrepresentations to the Court.

117. As an initial matter, the Court previously declined to strike Defendants' Answer in favor of lesser sanctions in the First Sanctions Order. *See Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *31–33. After the Court issued that Order on January 11, 2019, however, Aedo, for the joint benefit of the Titan Defendants, continued to improperly access and use Red Valve Price Data to advance Titan's business interests and to compete with Red Valve. Indeed, in the month following the First Sanctions Order and after Defendants were ordered to pay Plaintiffs' reasonable expenses, including their attorneys' fees, for Defendants' misconduct, Aedo accessed and used the P.I. Exhibits in blatant violation of the P.I. Order on January 18, January 25, January 28, January 29, January 31, February 4, and February 11. Lesser sanctions in that instance failed to dissuade either Aedo's misconduct or the other Titan Defendants' willingness to accept the fruits of Aedo's wrongdoing.

118. Moreover, the Titan Defendants' willful violation of the Court's orders has been constant and ongoing since this litigation began, was not slowed by the First Sanctions Order and the award of $108,667.50 in attorneys' fees and expenses against them, and further demonstrates that lesser sanctions will neither deter the Titan Defendants' future misconduct nor fairly address their unrelenting defiance of the Court's orders. At every turn, the Titan Defendants have shown a complete disregard for the legal process and the administration of justice, and the Court concludes that

the severest sanctions are necessary and appropriate to address their misconduct and protect the integrity of the judicial process.

119. It bears mentioning that the Titan Defendants have been on specific notice since this case began that compliance with the Court's orders was mandatory and that failure to comply with those orders would result in severe consequences. Indeed, even before the Court entered its P.I. Order, Plaintiffs began to present evidence that Defendants were not fully complying with the Court's orders. As a result, the Court advised Defendants in open court at the April 5, 2018 hearing on the P.I. Motion as follows:

> There's certainly direction to the Defendants to fully comply with my orders and consider everyone -- everyone on the Defendant side to consider themselves on notice that the Court does expect full compliance, and that failure to comply is punishable by the contempt powers of the Court.

(P.I. Hearing Tr., 107:4–9.)

118. Yet remarkably, just over a week later and only three days after the P.I. Order again "**RESTRAINED** and **ENJOINED**" Defendants "from using, disclosing, or distributing Plaintiffs' . . . Price Data" and required that Defendants return all Red Valve property, *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43, Aedo downloaded and accessed the Red Valve pricing documents in the Shadow Dropbox, (Walton May 2019 Aff. Ex. B, at Lines 10049–10053), for the benefit of the Titan Defendants. And just over a month later, Payne sought and obtained the Build Sheets USB which he knew contained over 1,000 Red Valve build sheets, (Walton Nov. 2018 Aff. ¶ 7; Payne Nov. 2018 Aff. ¶ 3), which he well knew were Red Valve Trade Secrets under the P.I. Order, (*see* Payne Nov. 2018 Aff. ¶ 3). Such bold defiance of the Court's P.I. Order, standing

alone, merits harsh sanctions, and when considered in conjunction with the evidence of record discussed at length above, makes plain that lesser sanctions do not adequately address the Titan Defendants' misconduct.

120. The Titan Defendants argue that such severe sanctions are not warranted because their actions were not willful and did not prejudice Plaintiffs. However, the record evidence, as discussed above, is decidedly to the contrary. For example, Aedo fails to offer any explanation in response to the forensic evidence showing that he secretly set up the Shadow Dropbox with Red Valve Trade Secrets, and his various explanations for accessing Red Valve's Trade Secrets in the P.I. Exhibits on over forty separate occasions during the course of this litigation lack all credibility. Similarly, the Titan Defendants do not dispute that Payne willfully asked a Red Valve employee to create a build sheet for a part based on Red Valve's Trade Secrets to further Titan's business, that he knowingly accepted and retained the Build Sheets USB containing over 1,000 Red Valve Trade Secrets, or that he failed to identify or return the Build Sheets USB for over five months and only identified the USB when confronted with the looming prospect of forensic discovery.

121. The Titan Defendants' claim of "no prejudice" is equally specious. The Court concluded in the P.I. Order that Plaintiffs would suffer irreparable harm should Defendants continue to use Plaintiffs' Trade Secrets during this litigation. *See Red Valve, Inc.*, 2018 NCBC LEXIS 41, at \*38–39 ("[I]t is clear that Defendants' actual and threatened misappropriation of Plaintiffs' Trade Secrets, if not enjoined, will damage Plaintiffs' business, adversely impact Red Valve's market position, and dull

its competitive advantage. That injury is 'not one to which [Red Valve] should be required to submit[.]' " (quoting *Barr-Mullin, Inc v. Browning*, 108 N.C. App. 590, 597, 424 S.E.2d 226, 230 (1993)). The developed evidence leads to the same conclusion. Indeed, the Forensic Reports show beyond doubt that the Titan Defendants have time and again used Plaintiffs' Trade Secrets during this litigation to price Titan's products and to compete with Red Valve. The resulting injury to Plaintiffs is the essence of unfair prejudice.

122. Finally, the Titan Defendants argue that the Court should consider imposing lesser sanctions against Payne because Aedo, not Payne, used the P.I. Exhibits and Shadow Dropbox in violation of the P.I. Order. As discussed above, however, the Court has considered lesser sanctions as to Payne and concludes that they are inadequate. Not only have the Titan Defendants been acting in concert during the entirety of the litigation for the benefit of their joint enterprise, but Payne has also knowingly and willfully acted in total disregard of the Court's various orders by failing to identify and return data sources, retaining Red Valve property, and seeking, obtaining, and retaining the Build Sheets USB. While Payne's conduct is less egregious than Aedo's on this record, it remains that Payne has also committed actions which warrant the most severe sanctions, including the striking of his Answer.

123. Therefore, the Court, in the exercise of its discretion, pursuant to its inherent authority and Rule 37(b), and after having carefully and thoughtfully considered the potential application of lesser sanctions, concludes that striking the

Titan Defendants' Answer and entering default against them is the most appropriate sanction in light of the Titan Defendants' misconduct.

2. Modifications to Return Protocol

124. Plaintiffs also request as a sanction that the Court modify the Return Protocol at Defendants' expense to allow Plaintiffs to re-conduct the Return Protocol with Reliance to ensure that all Red Valve property is returned to Plaintiffs and deleted from all of Defendants' devices, while allowing for a provision to protect the confidentiality of privileged information on Defendants' data sources. The Titan Defendants agree to allow the modified Return Protocol, but argue in favor of a $50,000 cap on the fees and expenses they must pay to complete the modified Return Protocol.

125. The return of Red Valve's property has been a central focus of this case since it began. After the Court ordered the Titan Defendants to return all Red Valve property to Plaintiffs on at least four separate occasions, *see Red Valve, Inc.*, 2018 NCBC LEXIS 139, at *7; *Red Valve, Inc.*, 2018 NCBC LEXIS 41, at *43; (Expedited Disc. Order 5; Order Clarifying P.I. 2–3), the parties spent six months negotiating a Return and Preservation Protocol to ensure that the Titan Defendants returned all electronically stored Red Valve property to Plaintiffs pursuant to the Court's return orders. The parties, and the Court, agreed to a final version of the Return Protocol in September 2018 that required Defendants to return all Red Valve property by November 7, 2018 and delete all Red Valve property by November 19, 2018.

126. The Return Protocol stated that:

The Data Sources listed in this Paragraph encompass all email accounts, cloud based storage accounts, computers, mobile devices, USB drives, and external hard drives in the possession of Defendants Payne, Aedo, and Titan, and the possession and control of Defendant Farris, which any Defendant believes (1) may contain or has ever contained any Red Valve Property, (2) has been connected to any Red Valve server or computer, or (3) has contained or does now contain any backup of any other Data Source.

(Return Protocol ¶ 3.)

127. The Titan Defendants, however, failed to identify at least four devices or accounts that were required to go through the Return Protocol process: the Aedo HP Laptop, the Google Drive to which Aedo copied the P.I. Exhibits, Ben Payne's Lenovo Ideapad, and the "STORE N GO" containing the Shadow Dropbox.[31] Additionally, even as to the devices that did go through the Return Protocol process, not all of Red Valve's property was deleted. As an example, it is undisputed that Payne's Dell Laptop still contains Red Valve property, even though that device was processed through the Return Protocol.[32] The Titan Defendants' conduct—and the demonstrated fact that the Titan Defendants have not returned all of Red Valve's property—therefore supports requiring the Return Protocol to be re-conducted at the Titan Defendants' expense.

128. The need for a revised Return Protocol is highlighted by events that have come to light after the June 4 Hearing on Plaintiffs' Second Sanctions Motion. By affidavit dated July 18, 2019, Payne averred that two of Aedo's laptops were now

---

[31] In addition, as discussed above, the Titan Defendants withheld at least four data sources falling within the scope of the Court's First Sanctions Order.

[32] Payne should have been alerted to the fact that that this device still contained Red Valve property, at a minimum, from the file names of these documents.

missing. (Aff. Ben Payne [hereinafter "Payne July 2019 Aff."], ECF No. 215.) According to Payne, on April 10, 2019, he shipped to Aedo in Mexico via FedEx both Aedo's Dell laptop (the "Dell Laptop"), HP laptop (the "HP Laptop" and, together with the Dell Laptop, the "Missing Laptops"),[33] iPad, Samsung Galaxy S6+ phone, and Samsung Galaxy S8+ phone. (Payne July 2019 Aff. ¶ 4.) Payne avers that he also shipped "personal goods" to Aedo, including "clothing, vitamins, and items for [Aedo's] baby." (Payne July 2019 Aff. ¶ 4.) Payne further asserts that he packed all of the items into two boxes, with one laptop in each box, and "bubble wrapped and secured the items." (Payne July 2019 Aff. ¶ 21.)

129. Payne offers evidence showing that he delivered two boxes to a FedEx location in Gastonia, North Carolina on April 10, 2019. (Payne July 2019 Aff. Ex. A, ECF No. 215.1.) Payne's April 10, 2019 receipt from FedEx indicates that he shipped a 12 x 8 x 6 inch box weighing 9.9 pounds and a 13 x 10 x 4 inch box weighing 3.6 pounds. (Payne July 2019 Aff. Ex. A, ECF No. 215.1.) FedEx tracking data shows that the two boxes were held by Mexican Customs from April 11, 2019 until May 16, 2019. (Payne July 2019 Aff. Exs. B, C, D, E, F, ECF No. 215.1.) On May 17, 2019, the packages were returned to Payne in Gastonia, North Carolina. (Payne July 2019 Aff. Exs. E, F.) According to Payne, however, the Missing Laptops were not enclosed in the boxes that were returned to him. (Payne July 2019 Aff. ¶¶ 21–22.)

130. Payne's story does not bear scrutiny. As Plaintiffs point out, the Missing Laptops are larger than the boxes reflected on Payne's April 10, 2019 receipt from

---

[33] It is undisputed that (i) the Dell Laptop is a Dell Inspiron 17 5000 Series and (ii) the HP Laptop is a HP Model 15t.

FedEx. In addition, the FedEx tracking data for the return shipment from Mexico[34] shows that one box was 11 x 13 x 9 inches and weighed 9.7 pounds and the other was a 13 x 11 x 5 inch box weighing 3.6 pounds. While the dimensions of the return packages are different from those reflected on Payne's April 10, 2019 receipt, there is only a 0.2 pound variation in weight, which contradicts Payne's notion that the laptops were not included in the return boxes.

131. At the June 4 Hearing on the Second Sanctions Motion—at which both Payne and Aedo were present—the Titan Defendants failed to mention the Missing Laptops, even though Payne had supposedly been aware that the laptops were missing for two weeks at that time.

132. In light of the Titan Defendants' conduct discussed above and based on the substantial evidence showing that Red Valve property remains on the Titan Defendants' devices despite the Court's repeated orders requiring the Titan Defendants to return all Red Valve property, the Court concludes that a modification of the Return Protocol is warranted to permit the Return Protocol to be conducted again by Plaintiffs' counsel and Reliance and that this process should be conducted at the Titan Defendants' expense. The Court has considered but will not impose a cap on the costs of this protocol process at this time, and the Titan Defendants may object to the amount of such costs for good cause shown. The Court shall also require

---

[34] FedEx assigned the packages different tracking numbers for their return.

the parties to meet and confer to establish an agreement and protocol, for court review and approval, to safeguard privileged material on the Titan Defendants' devices.[35]

### 3. Plaintiffs' Reasonable Expenses

133. Plaintiffs also seek as a sanction that the Titan Defendants be required to pay Plaintiffs' reasonable expenses incurred in bringing the Second Sanctions Motion, including payment of Plaintiffs' reasonable attorneys' fees.

134. It is "within the inherent power of the trial court to order [a party] to pay [the opposing party's] reasonable costs including attorney's fees for failure to comply with a court order." *Daniels*, 320 N.C. at 674, 360 S.E.2d at 776.

135. In addition to a trial court's inherent authority to award reasonable expenses for litigation misconduct, Rule 37(b) provides that, in lieu of or in addition to other sanctions, "the court shall require the party failing to obey the order to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." N.C. R. Civ. P. 37(b)(2). Thus, "when a party compelled to provide discovery [fails] to do so, an award of reasonable costs is *mandatory* unless the failure is substantially justified or an award would be unjust due to other circumstances." *Bradshaw v. Maiden*, 2018 NCBC LEXIS 46, at *21–22 (N.C. Super. Ct. May 9, 2018) (internal quotation marks omitted).

---

[35] The Court directs the parties to consider our Court of Appeals' recent decision in *Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, No. COA18-1054, 2019 N.C. App. LEXIS 658 (N.C. Ct. App. Aug. 6, 2019), in formulating a process by which the Titan Defendants' privileged information may be protected from disclosure.

136. Because awarded expenses are required to be "reasonable, the record must contain findings of fact to support the award of any expenses, including attorney's fees." *Benfield v. Benfield*, 89 N.C. App. 415, 422, 366 S.E.2d 500, 504 (1988).

137. As discussed above, the Titan Defendants have repeatedly failed to comply with numerous orders of this Court, including discovery orders. The Titan Defendants' unjustified misconduct has caused Plaintiffs to incur unnecessary expenses in this litigation.

138. At the June 4 Hearing, the Court forecast that it would order Aedo and Titan to pay Plaintiffs' reasonable expenses, including attorneys' fees.[36] The Court advised that it would determine appropriate sanctions against Payne at a later date. Upon further consideration, the Court, in the exercise of its discretion, concludes, based on Payne's misconduct as discussed at length above, that Payne should also be required to pay Plaintiffs' reasonable expenses, including attorneys' fees, as an appropriate sanction for that misconduct.

139. Accordingly, the Court concludes, in the exercise of its discretion and pursuant to the Court's inherent authority and under Rule 37(b), that the

---

[36] The Court specifically forecast at the June 4 Hearing that it would order Aedo and Titan to pay *all* of Plaintiffs' reasonable attorneys' fees and expenses to date. Upon further consideration and based on the Court's review of the relevant case law, the Court subsequently determined that it should modify its forecasted ruling. *Cf. Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) ("This Court has made clear that [an attorneys' fees sanction], when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature. . . . That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue."). By e-mail to all counsel dated June 5, 2019, the Court modified its forecasted ruling and noted that its assessment of reasonable expenses would be limited to "those incurred in (i) investigating the conduct necessitating the Motion and (ii) seeking and obtaining the relief afforded through the Motion, including prosecuting the Motion."

circumstances here warrant the entry of an order requiring the Titan Defendants to pay Plaintiffs' reasonable expenses, including Plaintiffs' reasonable attorneys' fees, incurred in (i) investigating the conduct necessitating the Second Sanctions Motion and (ii) seeking and obtaining the relief afforded through the Second Sanctions Motion, including prosecuting the Second Sanctions Motion.[37]

140. On June 18, 2019, pursuant to the briefing schedule set by the Court at the June 4 Hearing, Plaintiffs filed their Fee Petition. The Court intends to resolve Plaintiffs' Petition by separate order. In that order, the Court intends to address the total amount of fees and expenses to be awarded under the Fee Petition and the allocation of the payment of those fees and expenses between and among the Titan Defendants.

141. The Court further concludes that, as a further sanction, the fees and expenses Plaintiffs incurred to complete the Device Discovery Protocol should be shifted to the Titan Defendants. In its First Sanctions Order, the Court ordered Plaintiffs "to initially bear [the] cost" of the forensic device discovery but noted that the Court would "consider shifting the costs of this examination at a later date for good cause shown." *Red Valve, Inc.*, 2019 NCBC LEXIS 5, at *33 n.12. The Court concludes Plaintiffs have established good cause to shift these costs to the Titan Defendants by presenting evidence—much of which was obtained through the Device Discovery Protocol—that the Titan Defendants withheld critical information from

---

[37] Nothing herein shall prejudice Plaintiffs' right to seek all of its reasonable attorneys' fees pursuant to the Trade Secret Protection Act or the North Carolina Unfair and Deceptive Trade Practices Act, as appropriate.

discovery and continued to misappropriate Plaintiffs' Trade Secrets during the pendency of this action. The Court intends to address the amount of the expenses to be awarded and the allocation of those expenses between and among the Titan Defendants in its separate order resolving Plaintiffs' Fee Petition.

4. Modifications to Protective Order

142. Plaintiffs finally request that the Court modify the Protective Order in this case to preclude Gray Layton from viewing or possessing copies of Plaintiffs' confidential and attorneys-eyes-only documents or documents filed under seal in this action. Because Gray Layton is no longer counsel of record in this action and no longer has access to Plaintiffs' confidential documents, the Court concludes that this relief is unavailable and thus that the Second Sanctions Motion should be denied as moot as to this relief. *See, e.g., In re Hamilton*, 220 N.C. App. 350, 353, 725 S.E.2d 393, 396 (2012) (noting that an issue is moot whenever "the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue" (quoting *In re Peoples*, 296 N.C. 109, 147–48, 250 S.E.2d 890, 912 (1978)).

C. First Show Cause Motion

143. Through the First Show Cause Motion, Plaintiffs move the Court to issue an order to show cause why Defendants should not be held in civil contempt pursuant to N.C.G.S. § 5A-23 and in criminal contempt pursuant to N.C.G.S. § 5A-11. As noted, Plaintiffs base their First Show Cause Motion on the following conduct: (i) Aedo's contact with a Red Valve customer in violation of the TRO; (ii) Payne's solicitation and retention of the Build Sheets USB; and (iii) Aedo's posting the Marketing Image

to Titan's public LinkedIn page in violation of the P.I. Order. In addition, through the Second Sanctions Motion, Plaintiffs request the Court issue an order to show cause for civil contempt pursuant to N.C.G.S. § 5A-23, but do not specify the conduct upon which this request is based.

144. Based on its review of the evidence of record and the applicable law, the Court concludes that civil contempt is not appropriate on the facts of record here. Under N.C.G.S. § 5A-21(a), a party's failure to comply with a court order may constitute a "continuing civil contempt as long as" the following conditions are met:

(1) The order remains in force;

(2) The purpose of the order may still be served by compliance with the order;

(2a) The noncompliance by the person to whom the order is directed is willful; and

(3) The person to whom the order is directed is able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order.

N.C.G.S. § 5A-21(a).

145. A court's only means of compelling compliance of a person found in civil contempt is imprisonment as long as the civil contempt continues, subject to certain time limitations. *See* N.C.G.S. § 5A-21(b). An order holding a party in civil contempt must specify how the party may "purge himself or herself of the contempt," N.C.G.S. § 5A-23(e), and imprisonment must end once the person has purged himself or herself of contempt, N.C.G.S. § 5A-22(a). "Because civil contempt seeks to coerce compliance rather than to punish, the purge provision is essential to a civil contempt order." *Ray Lackey Enters., Inc. v. Vill. Inn Lakeside, Inc.*, 2016 NCBC LEXIS 9, at *23 (N.C.

Super. Ct. Jan. 29, 2016) (citing *Bethea v. McDonald*, 70 N.C. App. 566, 570, 320 S.E.2d 690, 693 (1984)).

146. The Court concludes that civil contempt is not appropriate based on the conduct Plaintiffs raise through the First Show Cause Motion because (i) Plaintiffs have not presented evidence that Aedo's contact with a Red Valve customer continues, (ii) Payne has now returned the Build Sheets USB to Plaintiffs, and (iii) the Marketing Image has been removed from Titan's public LinkedIn page. Because Plaintiffs have failed to show that there is a continuing civil contempt which the Titan Defendants may purge, the Court concludes that Plaintiffs' requests for an order to show cause for civil contempt through the First Show Cause Motion and the Second Sanctions Motion should be denied.

147. The Court further concludes, in the exercise of its discretion, that criminal contempt is not warranted in light of the other sanctions granted in this Order and Opinion. *See Kedar v. Patel*, No. COA16-781, 2017 N.C. App. LEXIS 828, at *4, *7 (N.C. Ct. App. Oct. 3, 2017) (concluding trial court acted within its discretion where court struck defendant's answer and awarded plaintiff's reasonable expenses under Rule 37(b) and "declined to find defendant in contempt" in light of other sanctions granted).

148. Accordingly, for the reasons set forth above, the Court concludes, in the exercise of its discretion, that the First Show Cause Motion should be denied.

CONCLUSION

149. **WHEREFORE**, the Court, for the reasons stated herein, in the exercise of its discretion, and pursuant to its inherent authority and under Rule 37(b), hereby **ORDERS** as follows:

   a. Plaintiffs' Second Motion for Sanctions and Contempt is hereby **GRANTED in part** and **DENIED in part** and the Court, in the exercise of its discretion, hereby **ORDERS** as follows:

   i. As to Plaintiffs' request for an order striking the Titan Defendants' Answer to Plaintiffs' Amended Complaint, the Second Sanctions Motion is **GRANTED**, and the Court, in the exercise of its discretion, hereby **ORDERS** as follows:

   1. The Titan Defendants' Answer to Plaintiffs' Amended Complaint is hereby stricken; and

   2. Default is hereby entered against Aedo, Payne, and Titan Valve.

   ii. As to Plaintiffs' request that the Court modify the Return Protocol, the Second Sanctions Motion is **GRANTED** and the Court, in the exercise of its discretion, hereby **ORDERS** as follows:

   1. Within fourteen days of the entry of this Order and Opinion, the parties shall meet, confer, and submit for the Court's review and approval a revised Return Protocol, which shall include an

appropriate process for protecting Defendants' privileged documents;

2. Plaintiffs shall re-conduct the Return Protocol on all of the Titan Defendants' devices meeting the definition of a Data Source in the modified Return Protocol, regardless of whether the data sources were subject to the Return Protocol originally;

3. The Return Protocol shall be conducted by Plaintiffs in conjunction with their forensic expert, Reliance Forensics; and

4. The Titan Defendants shall bear all fees and costs to conduct the Return Protocol ordered hereunder. The Titan Defendants may object to the fees and costs of the Return Protocol for good cause shown.

iii. As to Plaintiffs' request for payment of their reasonable expenses, including attorneys' fees, the Second Sanctions Motion is **GRANTED**, and the Court, in the exercise of its discretion, hereby **ORDERS** as follows:

1. Plaintiffs shall be entitled to recover from the Titan Defendants their reasonable expenses, including attorneys' fees, incurred in (i) investigating the conduct necessitating the Second Sanctions Motion and (ii) seeking and obtaining the relief afforded through the Second Sanctions Motion, including prosecuting the Second Sanctions Motion; and

2. The Court shall address the total amount of fees and expenses to be awarded hereunder and the allocation of the payment of those fees and expenses between and among the Titan Defendants in its separate order resolving Plaintiffs' Fee Petition.

iv. As to Plaintiffs' request that the Court shift the costs associated with the forensic examination of Defendants' devices ordered in the First Sanctions Order to the Titan Defendants, the Second Sanctions Motion is **GRANTED** and the Court, in the exercise of its discretion, hereby **ORDERS** as follow:

1. The Titan Defendants shall pay to Plaintiffs the costs associated with the forensic examination of Defendants' devices ordered in the First Sanctions Order; and

2. The Court shall address the total amount of costs to be awarded hereunder and the allocation of the payment of those costs between and among the Titan Defendants in its separate order resolving Plaintiffs' Fee Petition.

v. As to Plaintiffs' request that the Court modify the Protective Order to prohibit Defendants' former counsel from retaining copies of Plaintiffs' confidential and attorneys-eyes-only documents or documents filed under seal in this action, the Second Sanctions Motion is **DENIED as moot** as to this relief.

vi. As to Plaintiffs' request that the Court issue an order directing the Titan Defendants to appear and show cause why they should not be held in civil contempt of Court, the Second Sanctions Motion is **DENIED** as to this relief.

b. Plaintiffs' Verified Motion for Order to Show Cause is **DENIED**.

**SO ORDERED**, this the 3rd day of September, 2019.

<u>/s/ Louis A. Bledsoe, III</u>
Louis A. Bledsoe, III
Chief Business Court Judge